PHŒNIX KNITTING WORKS v. RICH et al.

(Circuit Court, N. D. Ohio, E. D.   July 22, 1911.)

No. 8,013.

1. PATENTS (§ 99*)—DESIGNS—SUFFICIENCY OF APPLICATION.

The practice of the Patent Office in requiring the omission of a detailed verbal specification from applications for design patents is not to be commended, it being doubtful whether such an application meets the requirements of Rev. St. § 4886 (U. S. Comp. St. 1901, p. 3382), and section 4929 as amended by Act May 9, 1902, c. 783, 32 Stat. 193 (U. S. Comp. St. Supp. 1909. p. 1274), that all applications shall contain a "written description" of the invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 133–139; Dec. Dig. § 99.*]

2. PATENTS (§ 252*)—DESIGNS—INFRINGEMENT.

When a design invention consists in nothing more than the bringing together of elements old in the art with slight modifications of shape in adapting or adjusting them to each other, the patentable novelty is only in the slight departure of form, and any subsequent use of the same basic elements with a variation of form of adaptation departing, to the discernment of an ordinary observer, from the slight change employed in the patent, is not an infringement.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 252.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—DESIGN FOR NECK SCARF.

The Mead design patent, No. 39,347, for a design for a neck scarf, is limited to the combination of a scalloped longitudinal edge and two transverse series of stitching at angles to each other in a scarf of the general kind described and is void for anticipation. Also, held not infringed, as so construed, if conceded validity.

In Equity.  Suit by the Phœnix Knitting Works against Nathan J. Rich and others.  On final hearing.  Decree for defendants.

See, also, 194 Fed. 696.

Hoyt, Dustin, Kelley, McKeehan & Andrews and Flanders, Bottum, Fawsett & Bottum (F. H. Bottum and F. E. Dennett, of counsel), for complainant.

J. H. Sampliner and Albert Lynn Lawrence, for defendants.

KILLITS, District Judge.  The complainant, the Phœnix Knitting Works, as assignee of design patent No. 39,347, for a neck scarf or muffler, granted June 9, 1908, sues the defendants Nathan J. Rich, Henry Rich, and Samuel S. Sampliner, as N. J. Rich & Co., in equity, for alleged infringements and accounting and injunction.  The answer denies both infringement and validity of the patent as for a new and original design.

The patent in question was adjudicated in the case of the complainant versus Bradley Knitting Company, by the Circuit Court of the Eastern District of Wisconsin in an opinion by Judge Quarles, reported in 181 Fed. 163.  From this decision no appeal was taken; a commercial arrangement having been entered into between the parties to that case.

The opinion of Judge Quarles was followed by this court, Judge Tayler sitting, in the granting of a preliminary injunction in this case,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and by Judge Holland of the Eastern district of Pennsylvania, in granting preliminary injunctions in two cases (Phœnix Knitting Works v. Grushlaw [C. C.] 181 Fed. 166, and Phœnix Knitting Works v. Hygienic Fleeced Underwear Co., 194 Fed. 702, opinion filed January 6, 1911), and by the Circuit Court of the Northern District of Illinois, Eastern Division, Judge Sanborn sitting, in granting a preliminary injunction in Phœnix Knitting Works v. Louer Brothers, 194 Fed. 700.

The case before this court is apparently the most hotly contested of all the actions, and, by stipulation, practically all the evidence in the other cases has been brought into this case, together with much additional testimony, so that we have a wider range of testimony and more facts to consider than were before either of the courts referred to.

It is logical to first determine the scope of the patent under consideration. The application was filed February 17, 1908. The declaration and specification read as follows:

"To all whom it may concern: Be it known that I, Joseph Mead, a citizen of the United States, residing at Milwaukee in the county of Milwaukee, state of Wisconsin, have invented a new, original and ornamental design for neck scarfs of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

"The figure is a plan view of a scarf showing my new design.

"The design consists in two ornamental connected aprons, each of which aprons is provided with a scalloped longitudinal edge and two transverse series of stitching at angles to each other, each series of stitches being located between opposing scallops.

"I claim the ornamental design for a neck scarf as shown."

The file wrapper and contents disclose that this application met with these vicissitudes:

First, an exhibit was required. This was submitted.

Then objection was made by the examiner as follows:

"The drawing does not properly show applicant's neck scarf, and a new drawing clearly showing the design as disclosed by the exhibit filed is required, when further consideration will be given the application. If a proper drawing be filed, the present detailed description would be surplusage and should be canceled."

It appears that the specific objection to the original drawing was that the apices of the scallops were too sharp or angular to be the result of knitting in yarn; the exhibit submitted showing the scallops rounded naturally at their points. This trifling correction was made satisfactory to the examiner in charge.

Then, acting upon the examiner's suggestion quoted above, that portion of the specification which reads:

"The design consists in two ornamental connected aprons, each of which aprons is provided with a scalloped longitudinal edge and two transverse series of stitching at angles to each other, each series of stitches being located between opposing scallops"

—was stricken out. With the record in this condition, this comment was made by the examiner:

"This application has been further considered in connection with the amendment of April 16, 1908, and the claim presented is held to be lacking in

invention and novelty in view of what is shown in the patents to Henry Boot, 114,397, May 2, 1871, improvement in knitted fabrics; J. H. Fleisch, 236,570, January 11, 1881, neck scarf; and W. B. Erskine, 445,137, January 20, 1891, neck scarf."

To this criticism counsel for the applicant replied as follows; the underscoring being ours:

"The references cited by the examiner have been carefully considered and, as understood, fail to show applicant's design for neck scarf.

"Patent to Boot shows a knitted fabric, but the stitching is entirely different from the stitching of the fabric shown in the neck scarf filed as an exhibit with this application.

"Patent to Fleisch, No. 236,570, and patent to Erskine, No. 445,137, both show neck scarfs, the enlarged ends of which are united by a relatively narrow connecting web: Neither of the patents, however, show the *enlarged ends of the scarf scalloped, as in applicant's device.*

"It is thought that the applicant's design sufficiently differentiates from the neck scarfs shown in the references cited as to enable an ordinary person to readily distinguish between them.

"In view of a recent oral interview with the examiner, during which the references cited were fully discussed, reconsideration is respectfully requested."

This moved the examiner, and the patent was allowed to issue June 9, 1908. As granted it reads simply:

"Be it known that I, Joseph Mead, a citizen of the United States, residing at Milwaukee, in the county of Milwaukee, state of Wisconsin, have invented a new, original, and ornamental design for neck scarfs, of which the following is a specification, reference being had to the accompanying drawing, forming part thereof.

"The figure is a plan view of a scarf showing my new design.

"I claim the ornamental design for a neck scarf, as shown."

[1] Reaching the conclusions hereafter set forth, we need not discuss the attacks made by defendants upon the patent for alleged technical irregularities; but we are entirely in accord with Judge Sanborn in his opinion in the Louer Brothers Case and with the court in Tompkins v. New York Woven Wire Mattress Co., 159 Fed. 133, 86 C. C. A. 323, in criticising the practice of the Patent Office in requiring the elimination of the detailed verbal specification and permitting the patent to depend for specification simply upon the drawing alone. With those courts, we doubt very much whether the amended application complied with the statute requiring a full and clear specification. There should be no more room for speculation as to the scope of a design patent, when the claims and specifications are under consideration, than in case of a mechanical invention.

However that may be, we are clear from this detailed history of the procedure in the office in this case that this patent, if valid at all, should be construed as within the narrow limits of the drawing only, and that all that is patented, if anything, is the combination of a "scalloped longitudinal edge and two transverse series of stitching at angles to each other, each series of stitches being located between opposing scallops." Judge Quarles, in the case referred to, evidently considered that the general shape of Mead's design was not involved, for he allowed an injunction against a scarf which differed decidedly and erratically in the neck piece, because, only, that the two "ornamental

connected aprons" were similar to Mead's, and it is to be observed that the examiner did not pass the application until satisfied that the novelty lay only in the ornamentation of the "aprons" by special arrangement of the stitching. It was conceded in argument that the "scalloped longitudinal edge" is the natural result of so changing the setting of the knitting needles as to get the effect of "two transverse series of stitching at angles to each other."

The form of the scarf as shown in the drawing is clearly anticipated by a British patent granted in 1861 to one Tolhausen, patent for "improvements in comforters, neckties, cravats, and the like articles of garment for the neck and chest." Tolhausen's declaration describes his invention as follows:

"These improved comforters are made up of a comparatively narrow band of silk, cloth, or other suitable material, which band surrounds the neck or throat, and its two ends joining at the front part of the throat widen out into two wide scarflike flaps or shirts, with which the wearer covers his chest, by either crossing the said flaps, or laying them parallel (more or less overflapping) on his bosom. At the point where the narrow throat band merges into the wider flaps, the comforter is united by means of a studd or button, or a breast pin, or a clasp, or any other suitable locking device."

This language is a very graphic description of the form of the Mead scarf.

In some degree also this form is anticipated by a British patent, granted in 1906, to one Briggs, who says:

"My invention relates to improvements in ties, scarves, mufflers, and all knitted neckwear, and in the manufacture of the same, and has for its object the shaping and fashioning of such articles combined with particular methods of forming them, as shall render them much more comfortable and convenient in use and of far better appearance than hitherto.

"The invention essentially consists of forming these articles, whether of wool, silk, cotton, or any combination of same, or other fiber, with a narrower and thinner portion at the back of the neck. This enables these articles accommodating themselves better to the nape of the neck."

Aside from the references made by the patent examiner quoted above as in apparent conflict with Mead's alleged invention, we are referred to a patent granted to Bickford in 1872 by the United States, for "improvement in knit fabrics and methods of knitting." Fabrics knitted according to the Bickford method as described in his patent papers, and offered in the case before us for illustration, show "scalloped longitudinal edges" and "series of transverse stitching at angles to each other." It must be kept in mind that Mead does not claim a peculiar stitch, but only an appearance or result, and his specification, which now is the drawing alone, does not indicate any particular stitch, except as to result.

There has been introduced in evidence also by defendants a book put out in 1903, called the "Priscilla Crochet Book," in which a stitch practically identical in appearance with that shown in Mead's drawing is illustrated and described.

The case of Smith v. Whitman Saddle Company, 148 U. S. 674, 13 Sup. Ct. 768, 37 L. Ed. 606, assists the court in its conclusion that this patent, if at all valid, is limited to simply the exact design as

shown, and we quote this language from the opinion, at page 680 of 148 U. S., at page 770 of 13 Sup. 'Ct. (37 L. Ed. 606):

"The experienced judge by whom this case was decided conceded that the design of the patent in question did show prominent features of the Granger and Jenifer saddles, and united two halves of old trees, but he said: 'A mechanic may take the leg of one stove, and the cap of another, and the door of another, and make a new design which has no element of invention; but it does not follow that the result of the thought of a mechanic who has fused together two diverse shapes, which were made upon different principles, so that new lines and curves and a harmonious and novel whole are produced, which possesses a new grace and which has a utility resultant from the new shape, exhibits no invention.' And he held that this was effected by the patentee, and that the shape that he produced was therefore patentable. But we cannot concur in this view." .

So that, if this may be said to be the law as applied to design patents, Mead could not be said to exhibit invention by simply combining elements that were old and common to such articles as neck mufflers. In the case of Smith v. Whitman Saddle Company, however, the Supreme Court found patentability in the mere fact that, in joining to the rear half of the Jenifer saddle the front half of the Granger form of saddle, there was a drop of the pommel at the rear somewhat sharper than in the Granger saddle, saying:

"The shape of the front end being old, the sharp drop of the pommel at the rear seems to constitute what was new and to be material."

However, they find that the saddles of the defendants, "while they have the slight curved drop at the rear of the pommel, similar to the Granger saddle, do not have the accentuated drop of the patent, which 'falls nearly perpendicularly several inches,' and has a 'straight inner side'"; and, because of this slight difference between the contending articles, the court holds that the defendants' design was not an infringement upon complainant's.

[2] The moral of this saddle case, as applied to the case at bar, is that, when a design invention consists in nothing more than the bringing together of elements old in the art with slight modification of shape in adapting them or adjusting them to each other, the patentable novelty is only in the slight departures of form, and that any subsequent use of the same basic elements with a variation of form of adaptation departing, to the discernment of an ordinary observer, from the slight change employed in the patent, is not an infringement. The case of Gorham Company v. White, 14 Wall. 511, 20 L. Ed. 731, hereafter cited, is not in conflict with this principle, for in it the patentability of the Gorham design of spoon handle as novel and original in all its elements was not at all considered; the sole question raised being whether White's design infringed.

Our conclusion, therefore, is that only an approximately intimate copy of Mead's "scalloped longitudinal edge with two transverse series of stitching at angles to each other" infringes whatever is valid in his patent, and that this consideration releases all of defendant's numbers save the three which Judge Tayler found to be substantial copies. Scarfs of the patterns which defendant was allowed to make under the preliminary order in this case upon a bond being given which have

straight longitudinal edges, although within the edge scallops appear, or which, being serrated or scalloped on edges, have the "two transverse series of stitching at angles to each other" interrupted by a change of needles to produce special longitudinal ornamentation of stitching on the flat surfaces of the "aprons," seem to us to be as striking departures from Mead's novel combination of old elements as that sustained as noninfringing in the saddle case above cited. This seems to be also the idea of the Patent Office, for since June, 1908, several design patents have been granted to Mead and assigned to complainant and to defendant Sampliner, assigned to defendant N. J. Rich & Co., for scarfs which differ from the original Mead design only in the stitching ornamentation. We notice, also, that, generally speaking, when infringements have been held in cases of obvious departures from the complaining design, as in the Gorham-White Case, the question of the novelty of the first design was not raised. A notable example is cited by complainant in Ashley v. Tatum Co. (C. C.) 181 Fed. 840, the inkwell case, decided by Judge Hand, in the Southern district of New York. In that case the two contending inkwells differed materially in appearance in detail, although the same radical departure from the lines of all other inkwells was common to both. The court there specifically found that there was no evidence before it showing that any one, before the complainant, had ever made an inkwell approximating in shape that in the complainant's patent, which was therefore basic in design. Mead, however, cannot be said to have a basic design patent in this case any more than could the complainant in Smith v. Whitman Saddle Company, supra.

[3] The question now remains to be considered whether the patent is valid even within these narrow limits. The law (section 4929, Rev. St., as amended [U. S. Comp. St. Supp. 1909, p. 1274]) says:

"Any person who has invented any new, original, and ornamental design for an article of manufacture, not known or used by others in this country before his invention thereof, and not patented or described in any printed publication in this or any foreign country before his invention thereof, or more than two years prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law and other due proceedings had, the same as in cases of inventions or discoveries covered by section 4886, obtain a patent therefor."

Simonds' Law of Patents, commenting upon this section, says, at page 212:

"For a time it was the practice of the Patent Office to grant these design patents for almost any subject-matter presented, and with little or no inquiry as to whether any degree of patentable origination had been exercised. It is now tolerably well settled that design patents stand on as high a plane as utility patents, and require as high a degree of exercise of the inventive or originative faculty. In patentable designs a person cannot be permitted to select an existing form, and simply put it to a new use, any more than he can be permitted to take a patent for a mere double use of a machine; but the selection and adaptation of an existing form may amount to patentable design, as the adaptation of an existing mechanical device may amount to patentable invention."

The Supreme Court, in the leading case of Gorham Company v. White, 14 Wall. 511, says, on page 526 (20 L. Ed. 731):

"We are now prepared to inquire what is the true test of identity of design. Plainly, it must be sameness of appearance, and mere difference of lines in

the drawing or sketch, a greater or smaller number of lines, or slight variances in configuration, if sufficient to change the effect upon the eye, will not destroy the substantial identity. * * * If, then, identity of appearance * * * is the main test of substantial identity of design, the only remaining question upon this part of the case is whether it is essential that the appearance should be the same to the eye of an expert. The court below was of opinion that the test of a patent for a design is not the eye of an ordinary observer. * * * With this we cannot concur. Such a test would destroy all the protection which the act of Congress intended to give. * * * Ex-. perts, therefore, are not the persons to be deceived. Much less than that which would be substantial identity in their eyes would be indistinguishable in the eyes of men generally, of observers of ordinary acuteness, bringing to the examination of the articles upon which the design has been placed that degree of observation which men of ordinary intelligence give. It is persons of the latter class who are the principal purchasers of the articles to which designs have given novel appearances. and if they are misled, and induced to purchase what is not the article they supposed it to be, * * * the patentees are injured, and that advantage of a market which the patent was granted to secure is destroyed. * * * We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other."

As suggested heretofore, it must be remembered that in this case the novelty of the Gorham design, in all its elements, was not in question in any form, wherefore the language we quote has little application to sustain a patent in a case where both novelty and originality are attacked. We quote the opinion here, however, because we believe the law is well stated by complainant, on page 77 of its brief, in this language:

"The test of novelty of a design, the test of infringement of a patented design, and the test of anticipation of a patented design are each and all the same simple test. Do the designs look alike to the eye of an ordinary observer—and not whether careful scrutiny and inspection will reveal differences."

It is easy to see why the same criterion operates to the same end in each of the three situations. Applying this principle to the facts before us, and recalling our conclusion that, if at all, the validity of the patent can only be upheld upon the appearance of the scalloped or serrated edges in connection with the two transverse series of stitching at right angles to each other, let us consider the testimony before us tending to show anticipation.

A large number of mufflers and neck scarfs which the evidence very conclusively shows were manufactured and in more or less use long prior to the date of Mead's application were produced before the court. They disclose forms or stitching, or both, resembling with more or less approximation that of the Mead design. Passing those of less consequence, we refer first to the Trask and Williamson mufflers, which were before the Illinois court, and which exhibit serrated or scalloped edges and zigzag stitches at least suggestive of the Mead design.

But the most important testimony, and that which is entirely new, not having been produced before either of the other courts, is exhibited in the Wilkinson scarf, shown to have been knitted in quantities prior to 1891, a large neck muffler the ends of which have a stitch and edge

answering very closely to the illustration of the Mead design, although the scarf itself is very much larger, and in the Thierfelder and Miller scarfs. Thierfelder, indeed, testified by affidavit in the Chicago case; but what was there but incompletely brought to the attention of the court is now before this court in the testimony of nine witnesses, who give their evidence in so artless a way, referring to domestic matters and other homely incidents for verification of dates and corroboration of statements, that the court is compelled to assume that they are intending to truthfully enlighten it. From them we learn that in the winter of 1904–05, Thierfelder, who was a knitter in a small way by occupation, produced in small quantities a scarf, a sample of which appears in this case as "Thierfelder's Sample Narrowed Neck Muffler No. 2." Considering only the enlarged ends or "aprons," as the term is used in Mead's original specification, we easily conclude that this fabric, supplied with a clasp and neatly folded in a carton, could readily pass to the ordinary observer for a muffler made after Mead's design.

Among the exhibits accompanying the testimony touching the Thierfelder production is a bill dated September 9, 1905, rendered by the United States Fastener Company, of Boston, to William Thierfelder, Kenosha, Wis., for ten gross of fasteners or studs, to be used on his mufflers, and the testimony is that his product was sold and publicly worn in his neighborhood in 1905.

Through the testimony of six witnesses, by deposition, we learn that one Max Miller, a manufacturer of knit goods in Brooklyn, N. Y., in the winter of 1905–06, made mufflers which he sold to the retail trade, among others to the witness Max Myres. Two mufflers said to be of this manufacture are produced in "Defendants' Exhibit Mrs. Miller's Muffler" and "Defendants' Exhibit Miller Muffler." Barring a little carelessness in knitting one of the enlarged ends or "aprons" in the latter, because of which the "scalloped longitudinal edge" on one side became straightened out, these articles are sufficiently similar to the Mead design as to lead a nonexpert to conclude, after superficial observation, that the same idea was followed in each.

We are aware that it is incumbent upon defendants to prove anticipation by very clear and very satisfactory evidence, and that the testimony must be rigidly scrutinized; but we think that this test is very fairly met. The witnesses speaking of these products cannot all be falsifying, and their testimony, fortified by the exhibits which they produce, is so clearly to the point that it can be explained away on no other hypothesis than that they must be totally disbelieved. There is no suggestion in the record that they are other than disinterested witnesses, and the court is not at liberty to discredit them upon whim alone.

We have alluded to the fact that there are many patents covering mufflers and neck scarfs and like articles involving various phases of the Mead design, reaching backward over a large space of time, and that neither form nor stitch was new in 1908. In Michigan, in central New York, in Philadelphia, in Eastern New York, in Wisconsin, the record shows neck mufflers of all sorts approximating to a more or

less degree the shape or stitching of the Mead muffler were being manufactured years before the date of Mead's application. These facts are very strongly corroborative of the claim of Myres and Miller, in Brooklyn, that the latter manufactured at the time he said he did the Miller mufflers, and of Thierfelder and his family and friends in Wisconsin that he manufactured "Thierfelder Sample No. 2."

Mead came into the art when the shape was old, the stitch was old, and the application of each to a neck muffler was old, and it is easy to see how entirely probable it is that likewise his special idea was both old and common to the knitting business.

We conclude, therefore, that the patent is invalid because of the anticipations shown on the record. In this conclusion we are in conflict with the Circuit Court of the Eastern District of Wisconsin and the courts which have followed that court.

The court in the case of Phœnix Knitting Works v. Bradley Knitting Co. (C. C.) 181 Fed. 164, seems to have been very much impressed by the extensive market enjoyed by the complainant for its scarf, and it has been urged to us as one of the evidences of novelty that the complainants have marketed half a million dozen of their mufflers, showing extreme popularity for their styles. We are not impressed with this fact as an evidence of the novelty of the Mead design in opposition to the apparent anticipations shown in evidence, for the reason that the market enjoyed by the complainant is plainly the fruit, as shown by the testimony, of very shrewd and extensive advertising. We suppose it is true that a design which by mere merit attains quick and great popularity must have the grace of novelty; but a great popular demand which is stimulated and worked up by much money and ingenuity spent in advertising does not go far in suggesting the same attribute.

Judge Quarles, in the case referred to, uses this language:

"The court was strongly impressed, while examining the complainant's samples and the various advertisements thereof in newspapers and magazines, that there is something very attractive about complainant's design. It is difficult to describe the peculiar elements which produce this effect. It may, in the language of the trade, be said to be 'jaunty,' 'natty,' 'smart,' 'neat.' Its lines are graceful. It is not the zigzag stitch alone, it is not the color nor the serrated edges, but what the French would call the 'tout ensemble,' that is responsible for this pleasing effect. Other scarfs have been exhibited showing various features that seem quite like the scarf of Mead; but they do not awaken the pleasing impression that is so marked in the complainant's design. Some are clumsy and coarse, and none of them approximate the complainant's design as to the general effect on the eye of the ordinary observer."

Judge Holland, in Phœnix Knitting Works v. Grushlaw (C. C.) 181 Fed. 167, quoted this language with approval and evidently because it had made much impression upon him.

Studying this case with the enlarged record before us, and applying to the case the decisions referred to, we are unable to see any substantial difference between the alleged anticipations brought to the attention of the court in this case for the first time and the Mead design as put upon the market by the complainant, except as to the "neat," "natty," "jaunty," "smart" way in which the complainant manufactured the latter and boxed it for the market—characteristics which

seem to have left so great an impression upon the Wisconsin and Pennsylvania courts. But Mead did not get a patent for "neatness" and "jauntiness" and "smartness" and "nattiness," but for a combination of a serrated or scalloped edged scarf with two transverse series of stitching at angles to each other, and it would seem to us that it would be carrying the patent law exceedingly far to put the premium of an exclusive right upon mere delicacy and taste in the manufacture and preparation for the market of a device which otherwise is not novel. Mere polish of an old idea is not invention.

A decree may be entered to the effect: First, that defendants have not infringed upon any of the rights of complainant under the Mead design patent, No. 39,347, in and by the manufacture or sale of mufflers known as defendants' Nos. 7,200, 7,201, 7,202, 7,001, 7,000, 7,300, 7,119, 7,115, 7,113, 7,212, 7,211, 7,210, 7,204, 7,213, 7,101, 7,100, 7,104, 7,112, 7,114, 7,103, 7,203, 7,116, 7,111, 7,118, 7,500, respectively; second, that defendants have not infringed upon any of the rights of complainant as alleged in its bill by reason of the invalidity of said Mead design patent, No. 39,347, for anticipation of all its claims; that the preliminary injunction and the permissive order heretofore entered in this case be dissolved; that defendants' bond heretofore required by the court be dissolved; and that defendants recover costs, which shall include the reasonable expense of printing defendants' record. Defendants' motion for reference to take an account for damages sustained by defendants because of the preliminary injunction is passed for future consideration. Let the decree save complainant's exceptions and right of appeal.