PHŒNIX KNITTING WORKS et al. v. RICH et al.

(Circuit Court, N. D. Ohio, E. D.  November 27, 1911.)

No. 8,068.

1. PATENTS (§ 162*)—CONSTRUCTION—EFFECT OF PROCEEDINGS IN PATENT OFFICE.

An applicant cannot obtain favorable action by the Patent Office on the theory advanced to the examiner that the invention consists of but a narrow distinction from the inventions previously patented or articles in common use, and, after securing a patent, insist that it should be given by the courts a broad construction such as was refused by the Patent Office and abandoned there by the applicant.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 237; Dec. Dig. § 162.*

Conclusiveness and effect of decisions of Patent Office in proceedings on applications, see note to Novelty Glass Mfg. Co. v. Brookfield, 95 C. C. A. 530.]

2. PATENTS (§ 328*)—ANTICIPATION—MUFFLER.

The Mead patent, No. 963,235, for a knitted neck scarf or muffler having a V-shaped neck portion extending downward in the back, is void for anticipation in the prior art.

3. PATENTS (§ 325*)—SUITS FOR INFRINGEMENT—COSTS—UNNECESSARY EXPENSE.

A defendant in a patent suit, whose counsel were compelled, without adequate reason, to go from Milwaukee to Denver to take the deposition of the patentee, although his place of business was in Milwaukee, and he was there a few days previously, and after the service of notice to take other testimony there, *held* entitled to have the unnecessary expense so incurred taxed as costs against complainant.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 325.*]

In Equity. Suit by the Phœnix Knitting Works and the Bradley Knitting Company against Nathan J. Rich, Henry J. Rich, and Samuel S. Sampliner, doing business under the firm name of N. J. Rich & Company. On final hearing. Decree for defendants.

Hoyt, Dustin, Kelley, McKeehan & Andrews, Flanders, Bottum, Fawsett & Bottum, and Erwin & Wheeler (A. C. Dustin, F. H. Bottum, L. C. Wheeler, and F. E. Dennett, of counsel), for complainants.

J. H. Sampliner and Albert Lynn Lawrence, for defendants.

KILLITS, District Judge. The complainants sue as assignees of letters patent, dated July 5, 1910, No. 963,235, issued on an application filed August 9, 1909, to Joseph S. Mead, for an improvement in mufflers. The bill contains the customary allegations to establish the validity of the patent, that the invention was in extensive public use, and that the defendants infringed, including a prayer for an accounting and an injunction, preliminary and perpetual. The answer denies the novelty of the invention, that it embodies patentable matter, and that the defendants infringe. No temporary injunction was urged, and the case is before the court on the merits.

This patent was adjudicated at the suit of the complainants against the Hygienic Fleeced Underwear Company, in the Eastern district of Pennsylvania, opinion by Witmer, J., filed October 9, 1911 (194 Fed.

717), and it is one of several patents, design as well as mechanical, recently issued by the patent office upon the subject of a style of neck muffler now quite popular, one of which was before this court in the suit of Phœnix Knitting Works v. Rich et al., 194 Fed. 708, the present defendants, and declared invalid in an opinion filed. The record in the Pennsylvania case is before us, and from it and the opinion of the court it is clearly apparent that we have a more extensive set of facts and a much more serious defense to consider than were before the court in that case.

The patent at bar contains three claims, and underwent a peculiar experience in the Patent Office, which is urged to the court as one of the grounds of invalidity. The description of the alleged invention, verbal as well as drafted, discloses a neck muffler, with a central neck band, in four well-defined sections, the two central sections forming a V, integrally connecting with narrower horizontal sections, which integrally connect with end sections or aprons, which are designed to overlap and extend and cover the chest of the wearer, the point of the V in the central neck portion performing the triple function of a covering to the upper part of the wearer's spine, of affording a better adjustment around the wearer's neck, and of securing, through the pressure of the coat collar thereon, its retention in position. The inventor also claimed that this peculiar construction lessened the liability of stretching or distortion through wear. The specifications also disclaim any limitation to the precise formation and arrangement of the several parts, but claim protection for such manifest modifications as were within the principle and spirit of the invention.

The claims as originally framed in the application were substantially within the limitations of the invention as described. During the progress of the case through the Patent Office, under rule 96, the examiner in charge suggested, for the purpose of declaring an interference, that the first claim be withdrawn, and that a claim which was present in three other pending applications be substituted for claim No. 1, in the following language:

"As a new manufacture, a knit scarf consisting in the combination of two elongated rectangular end members and a central V-shaped member formed integrally and having parallel upper and lower marginal edges."

The applicant accepting this suggestion, an interference was declared with the applications of Meyers, Rosenfeld, and Tyrrell (two of the last).

It is quite apparent that these four alleged inventors were dealing with substantially the same alleged invention. During the progress of the interference, Meyers became in default, and Rosenfeld and Tyrrell (the former abandoning his attorneys and accepting the latter's counsel) yielded to Mead; Rosenfeld conceding priority to Mead, and Tyrrell abandoning the subject-matter of the issue.

At first Rosenfeld was represented by counsel in Detroit. His concession, however, was executed in Milwaukee, the home of the Phœnix Knitting Works, in the presence of counsel for Tyrrell and for Mead. Tyrrell was an officer of the Bradley Knitting Company, and,

upon the allowance of the patent to Mead under these circumstances, the Bradley Knitting Company became joint owner with the Phœnix Knitting Works, of which corporation Mead was vice president.

The facts give the court very little reason to overindulge the presumption that allowance by the Patent Office is a prima facie establishment of the novelty of the invention and identity of the inventor. They are too redolent of an amicable adjustment, if not of a juggling, and all the more suggestive in view of the fierce competition in the knitting art over the subject-matter. The effect was to read into the Mead patent the only claim which is worthy of the court's serious attention, and which, in its terms, is plainly at some variance with the description of his invention.

Three mufflers are offered by the complainant as samples of the styles which they claim the right to make under this patent. Complainant's Exhibit No. 1 is a muffler which answers the description of the patent, having six plainly marked sections, four in the neck portion, as described. It meets the terminology of claims 2 and 3.

Exhibit No. 2 is a muffler with three sections to the neck portion, the outer sections being diagonal to the apron extremities with which they are integrally connected, but separated from each other by a horizontal central portion, forming a U-shape for the neck. It can come under no claim of the patent, and is so divergent from any description that, if it is under the patent, it must be regarded as within the reservation, a mere modification without material departure from the principle and spirit of the invention.

These two exhibits are the manufacture of the Phœnix Knitting Works. The third exhibit is made up of four parts; the apron extremities and neck portion consisting of two sections, forming a large V. It is a product of the Bradley Knitting Company.

Three mufflers of the defendant are alleged to be infringements. One, defendants' "illustrative Exhibit," we may dismiss, because it is conceded that the only attempt made by defendant to manufacture it was in the making of one solely for illustrative purposes in this case and subsequent to the filing of the complaint. It is substantially identical with complainants' Exhibit No. 1, and defendants are not attempting to otherwise make it.

Another is a substantial copy of the Bradley manufacture, having a large V-neck, with no horizontal sections in the neck portion. If claim No. 1 in the patent is valid, it is a clear infringement.

The remaining article alleged for infringement is a U-neck muffler, upon which the Patent Office has granted defendants' assignor a patent.

In the view we take of the state of the art prior to Mead's application, and the limitation which must be placed on the construction of Mead's patent, if valid at all (which will be hereafter discussed), we may dismiss once for all, as noninfringing defendants' U-shape muffler, upon the principle that what is claimed to be an infringement on a patent would be held to be an anticipation if offered for that purpose, for its construction and shape is clearly a more material departure from the lines of the Mead muffler, as described in his patent;

than are several of the constructions offered for our consideration as anticipations.

[1] We believe it to be a correct principle that one cannot obtain favorable action by the Patent Office upon the theory advanced to the examiner that the invention consists of but a narrow distinction from the inventions previously patented or articles in common use, and, after obtaining a patent upon this line of argument, insist that it should be given by the courts a broad construction such as was refused by the Patent Office and abandoned there by the applicant.

The history of claim 1 illustrates our position. The Tyrrell application was filed eight months earlier than Mead's. Within a month, by amendment, what appears now as claim 1 in the Mead patent was added to Tyrrell's claims. The examiner, nearly two months before Mead applied, rejected the Tyrrell application, saying that claim 1 was anticipated by a patent issued to Scott and by the Pick (British) patent, hereafter considered by us. In a statement to the examiner in chief, the examiner comments:

"All that appellant appears to have done is to construct a muffler of the form shown by Pick, of knit fabric, instead of from the material specified by said Pick patent. The use of knit fabric for the construction of scarfs and mufflers is as old as the use of these articles of apparel. The patent to Scott shows a knit structure and was cited for this purpose alone.

"To merely knit a muffler of the old and well-known form shown by Pick from cloth or fur would certainly involve nothing more than the substitution of one well-known material for another. Appellant appears to rely entirely on some slight changes in the design of his structure over that of Pick. * * * It is perfectly plain that they are matters of design only and have no place in an application for a mechanical patent.

"The substitution of one material for another necessarily carries with it certain slight changes in the design of the article produced. The useful features of applicant's scarf, namely, the rectangular end members, and the pointed V-shaped neck portion extending downward in the back, are clearly shown by Pick and are fully capable of performing all the functions claimed for them by appellant."

On appeal, counsel for Tyrrell, who are of counsel for complainants in this case, urged upon the examiners in chief, among other things, this:

"Owing to its angular V-shaped central portion, it is adapted to be more easily and cheaply manufactured by the knitting process than scarfs having a curved or semicircular portion."

Upon this, and other arguments pertinent to the description of Tyrrell's invention, but not consistent with Mead's description, either verbal or pictorial, the examiners in chief allowed the claim to Tyrrell in this language:

"This claim is specific to the construction shown in the drawings and differs considerably from the neck scarfs shown in the references."

We interpret this to mean that all that is allowed is precisely the construction shown in the drawings (Tyrrell's, not Mead's); and the language which we have quoted, both from the arguments of counsel and the decision of the board, very clearly excludes the idea that a claim was then contemplated which should cover a manufacture with a U-shaped neck portion.

Two or three days later, the examiner, ignoring the plain dissimilitude between Tyrrell's claim 1, allowed by his superiors over his rejection only on the narrow basis that it was specific to Tyrrell's described construction, and the muffler Mead is talking about in his application, invited the latter, as above stated, to adopt it, and thus gave it a breadth of application then for which neither its originators ever contended, nor the examiners in chief granted. Plainly, if the board acted advisedly in Tyrrell's case, in giving a reason for overruling the examiner and allowing the claim then, had the examiner rejected this claim if original with Mead, they would have sustained him, for a greater reason existed for declaring it inapplicable in Mead's case than Tyrrell's, and the criterion of distinction which the reasoning of the examiners in chief sets up but more vividly discloses the inapplicability of the claim to Mead's alleged invention. This manifest improvident dragging of Mead's case into the interference between the other three applicants, who were really on common ground, became subsequently a special providence to complainants in this case through the treaty, noted above, between Rosenfeld, Tyrrell, and Mead; the two earlier applicants yielding to the later (Mead) the honors of invention after the Seattle man (Meyers) lost heart. Much opportunity as there exists here to question the patent before us, we are pleased to assume, for the purposes of this case, that claim 1 is validly a part of it, and thus escape the otherwise necessary consideration of the trivial technicalities and microscopic distinctions indulged in the administration of the patent law which are making a patent right something of a joke in popular estimation, and which cause a question if it is a subject for national congratulation that we have passed the million mark in the issue, in which fact debate is possible whether the proof is of the inventive genius of our people or of a phenomenal capacity for hair splitting; for there is left in this case, to its determination, the comparatively easy task of weighing the evidence upon the subject of the field open to Mead's fertile and inventive brain.

In Elliott v. Youngstown Co., 181 Fed. 349, 104 C. C. A. 179, the court remarks:

"The fact that so many persons caught the idea goes rather to prove that it was simple and obvious, and not that it required inventive genius to conceive. It is not like the case where the art is waiting for the device, and inventors striving unsuccessfully to produce it."

The pertinency of this observation to this case is obvious when we recall the fact that at the same time several men, who lived in widely scattered portions of the country, were in the Patent Office simultaneously claiming this alleged invention.

These coincidences may be explained by the state of the prior art, which is well exhibited by the record in this case. So great a contrast in defenses exists between the record here, and that before the court at Philadelphia, that some ground is afforded for the suspicion that just enough was made in the latter court to present an adjudication on the apparent merits. We have had, in Phœnix Knitting Works v. Rich et al., 194 Fed. 708, involving Mead's design patent, a somewhat

similar experience, and were compelled in that case, because of a larger record and more complete defense, to differ with the Circuit Court for the Eastern District of Wisconsin and hold the patent then under consideration invalid. The Wisconsin case (Phœnix Knitting Works v. Bradley Knitting Company [C. C.] 181 Fed. 163) was between the two complainants in the case at bar, then in apparent adverse relation, and represented therein by counsel as adversaries who now with their clients join in prosecuting the suit against the defendants herein.

We have alluded above to the fact that the interference involving the application for the patent in suit was resolved in Mead's favor by the surrender in the home city of Mead's company, of his rivals, Tyrrell and Rosenfeld. · It is interesting to note that this took place six weeks before Judge Quarles' decision of the case in 181 Fed.,.which may account for the feebleness of a defense which enabled the court to find the design patent valid. Within a month after this decision was had, and just a week after the allowance of the Mead patent now under consideration, the adversaries in that action became the joint assignees of Mead's rights thereunder. The parallel of frail defenses between the Wisconsin and Pennsylvania cases may be a mere coincidence. If so, it becomes all the more remarkable when we compare the record of the latter with that before us dealing with the same patent and the same contention.

[2] In the answer to the bill in the case at bar it is alleged, among other things that the Mead device was anticipated by a muffler sold by Max Myres of New York. In the Philadelphia case the same defense was offered. In March, 1911, for use in this case, as well as in the design case heretofore decided by this court, the depositions of six witnesses were taken on this subject, and their testimony is before us for consideration. In April a stipulation was entered into between counsel for complainant and defendant in the Philadelphia case that the testimony of four of these witnesses as taken for this court might be used there on behalf of the defendant. The witnesses whose testimony.was not stipulated in that case were the manufacturer who.made the article sold by Myres, and his wife. The names of these witnesses and the importance of their testimony were clearly indicated in the depositions used before Judge Witmer, and why all of the evidence then in deposition which was available was not employed for the defense of the Hygienic Fleeced Underwear Company is incomprehensible. The court says of the Max Myres muffler that it was of the "type in suit," and, although regarding the testimony as thus important, rejected it, for the purposes of the case before it, because it was not clearly proven to the court's judgment that the transaction occurred before Mead's alleged invention. How it would have been regarded with the corroboration of the omitted depositions is another question.

In deciding Phœnix Knitting Works v. Rich et al., 194 Fed. 708, we accepted these depositions with others as proving anticipation of the Mead design, making this comment, pertinent here as applied solely to this testimony:

"We are aware that it is incumbent upon defendants to prove anticipation by very clear and very satisfactory evidence, and that the testimony must be rigidly scrutinized; but we think that this test is very fairly met. The witnesses speaking of these products cannot all be falsifying, and their testimony fortified by the exhibits which they produce, is so clearly to the point that it can be explained away on no other hypothesis than that they must be totally disbelieved. There is no suggestion in the record that they are other than disinterested witnesses, and the court is not at liberty to discredit them upon whim alone."

Applying to the proper consideration of the testimony of the four witnesses on this point whom Judge Witmer considered that of Mr. Miller and his wife, not in the Philadelphia record, we are compelled to find that, in the early part of 1906, Miller made and sold to Myres a quantity of mufflers which are plainly within claim 1 of the Mead patent and clear anticipations thereof. The witnesses testify with a wealth of references to domestic matters, places of residence and business, and other details, easily susceptible of disproof if false, and, their six depositions being unimpeached and read together, establish both fact and date, unless we arbitrarily reject them as credible witnesses which we cannot do.

Undoubtedly the court must scrutinize carefully the testimony offered to establish a prior use, and the rule should be observed that in such testimony the evidence must appear superior to a mere preponderance and must prove the priority strictly; but there is no hard and fast rule which would exclude such testimony as that touching the Myres muffler, and, bearing in mind the conditions under which these witnesses testified and the fair opportunity offered by the character of their testimony to impeach them, if that were possible, we are minded to accept it for what it purports to be worth. As in Sipp v. Atwood, 142 Fed. 149, 154, 73 C. C. A. 367, the subject-matter is "so simple in character that it is impossible to believe that an ordinarily intelligent man could be mistaken" as to its exact form and function.

Credence of this Myres testimony is assisted by the fact already noticed that at least three applicants were simultaneously before the Patent Office with his construction, one of whom (Meyers), separated from him by the continent, had made and sold a muffler of very nearly the same pattern before Mead applied, and also, by the state of the prior art, which was such as to give rise naturally to the application of V-neck shapes to knitted mufflers.

Stryker, in 1874 (No. 148,389), patented a fur collar which embodies in its shape the suggestion of Tyrrell's V-neck. The Stryker design in knitting is an illustrative exhibit in this case. Pick, in 1878, patented (No. 208,034) a cloth tippet or Victorine, having previously obtained a British patent, in a shape sufficiently suggestive to cause the examiner to use it as a controlling reference for the rejection of Tyrrell's application as we have seen above. Flues, in 1870, was granted a design patent (No. 3,987) for a shawl mantle which is in the shape altogether of Tyrrell's V-neck, a knit illustration of which is before us. Bickford, in a patent allowed him in 1872 (No. 131,387) for "improvements in knit fabrics and methods of knitting," shows in

his figure 1 what is substantially one-half of Tyrrell's V-neck muffler. The figure is manifestly incomplete, and is plainly intended to be suggestive of what might be accomplished by following the patentee's methods. Any one of most ordinary intelligence, in the fierce competition of the muffler business, could see the V-neck in Bickford's design. Several other early patents, less suggestive but still embodying the germ of the idea, are before us also. The industry of defendants' counsel has also disclosed a "crochet kerchief" illustrated in an 1868 issue of "Harper's Bazaar," which has a "bias upper edge," disclosing an effect producing Mead's and Tyrrell's results in neck adjustment, and presenting an adjusted appearance very similar in the drawing to Mead's figure 2. Solomon Meyers, the Seattle man, who, three weeks before Mead, applied for a patent on a construction with a V-neck, blunting the point of the V by a few horizontal stitches, says that the idea came to him because in 1904 he was employed in the Blauvelt factory in Newark, N. J., where was knitted a sweater with a V-shaped opening faced with an integrally knitted facing, which follows the lines of Bickford's figure 1, and which is before us in an illustrative exhibit. Tyrrell also obtained a patent in Canada, more than a year before Mead's application, for an identical V-neck muffler. Thierfelder, at Kenosha, Wis., in 1904, produced and sold a muffler with serrated or V-shaped edges about the neck portion, effecting the same result touching distortion about the neck as is claimed for Mead's invention, and in his testimony remarks that:

"There are different sizes of zigzag. There is five round and six round, and you might make a zigzag two hundred round."

Tyrrell's V-neck is clearly the result of a number of "zigzag" rounds in knitting.

None of the foregoing testimony was before the Pennsylvania court, except, as we have noted, part of that relating to the Max Myres mufflers, and Tyrrell's Canadian patent, which, upon the evidence before that court, was very properly there disregarded because the date of its application is subsequent to Mead's proved use of his invention. The Pick (British) patent was, indeed, pleaded in defense in the Hygienic case, but not brought to the court's attention, although considered so important by the examiner in rejecting the V-neck claim. And, as further suggesting the fragility of the defense before Judge Witmer's court, we note that, of the six witnesses for complainant in rebuttal, five, who alone speak to the important issue of anticipation, including Mead himself, were not even cross-examined.

We admit the cogency of the reasoning upon the record before the court in the Eastern district of Pennsylvania of the opinion in that case; its conclusions could hardly have been otherwise. But the different and more ample facts in testimony before us deprive the judgment of that court of the persuasiveness which, under other circumstances, it would be entitled to. That court undoubtedly acted upon the assumption that all the light obtainable was before it; we are able to see clearly that such was not the case. Whether the absence of easily obtained testimony of importance was due to a purpose, or

mere oversight, we ought not to venture an opinion; the result is the same in any event.

Some question also arises whether Mead actually applied for his patent (August 9, 1909) within the two years limitation. In cross-examination, Q. 82 and answer are as follows:

"Q. 82. I find in the preliminary statement that you 'reduced said invention to practice on or about the first part of the month of April, 1907.' Will you please state what you did at that time to warrant you in stating under oath that you had reduced the invention to practice? A. As soon as it came out, I immediately went out to get orders on it."

And some testimony of Wiener, his colleague, as an officer of the Phœnix Works, tends to support the claim that the invention was public prior to August, 1907. However, we feel that we are giving the rule requiring strict proof of anticipation full honor when we hold that anticipation of this invention is established by the evidence in this case.

Of course, it is not invention to substitute one material for another to produce the same result, and the modifications in the Tyrrell-Mead pattern from those existing in the above references are so simple as manifestly not to require the faculty of invention. American Roll Paper Co. v. Weston, 59 Fed. 147, 8 C. C. A. 56.

In the words of the court, in Lee v. Hart (C. C.) 43 Fed. 670:

"If the improvement had been a complex mechanism, if the essence of the invention had been the nice adjustment of parts to produce a result, or if the thing to be done required genius of a superior order, the testimony would have been insufficient."

As this court says, we must not forget "that it requires less testimony to establish a fact which was very likely to have occurred than to establish an improbable theory."

Our conclusion, therefore, is that the bill should be dismissed.

[3] Two matters remain to be disposed of. Over the objection of counsel for defendant, they were required to go from Milwaukee to Denver, Colo., to take the deposition of Mead, whose place of business was in Milwaukee, whereat he had been but a short time before the taking of the depositions and after notice had been served, although within a few days after his presence in Milwaukee defendants were required to be there for the taking of depositions on behalf of the complainants, notice for which was previously given. We think that it was very easy to have saved the defendants the additional expense of proceeding from Milwaukee to Denver for the purpose of taking this deposition, and that the excuse given to the court therefor is inadequate. Wherefore we grant the motion of the defendants that an audit should be had of its reasonable expense in this behalf, to be taxed as part of the costs against the complainants in this case. So much scandal has been occasioned by the oppressive expense of patent litigation that this court, for one, feels the advisability of suggesting that litigants treat each other fairly in this behalf.

We shall also tax against the complainants the reasonable costs of printing defendants' record.