## HAZELTINE CORPORATION v. GENERAL MOTORS CORPORATION.

### No. 1260.

#### District Court, D. Delaware.
#### May 8, 1941.

William H. Davis, R. Morton Adams, and Baldwin Guild (of Pennie, Davis, Marvin & Edmonds), all of New York City, and E. Ennalls Berl (of Southerland, Berl, Potter & Leahy), of Wilmington, Del., for plaintiff.

Drury W. Cooper and C. Blake Townsend (of Cooper, Kerr and Dunham), both of New York City, and Hugh M. Morris, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is the usual patent infringement suit. It charges infringement of U. S. Patent No. 2,111,483 issued March·15, 1938, to Carl E. Trube, assignor to Hazeltine Corporation, upon application filed July 2, 1926. Suit was brought April 19, 1938, thirty-five days after the issuance of the patent. · The defenses are invalidity and noninfringement.

The claims originally in suit as specified in plaintiff's bill of particulars were numbers 1 to 4, inclusive; 12 to 22, inclusive, and 28 to 38, inclusive. At the trial plaintiff withdrew all but claims 28 to 33, inclusive, and 35 to 38, inclusive. Claims 31 and 36 were selected as typical:

"31. The method of transferring electrical energy throughout a range of frequencies from an exciting circuit to a tunable absorbing circuit, which consists of transferring the energy both electromagnetically and electrostatically in aiding phase, and causing said electrostatic transfer to vary in a preselected manner as said absorbing circuit is tuned."

"36. A tunable radio-frequency coupling system comprising a resonant circuit including inductive and capacitive elements, only one of said elements being adjustable for tuning said circuit over a wide range of radio frequencies, another circuit to be coupled therewith, fixed reactance coupling means including inductance for providing coupling therebetween which varies with frequency in one sense as said tunable circuit is tuned over said range, and fixed reactance coupling means including capacitance for providing coupling therebetween which varies with frequency in the opposite sense, said coupling means being relatively poled in aiding phase, whereby the coupling variation of one said means at least partially compensates for the coupling variation of the other said means."

Plaintiff consents that the final judgment shall contain a provision that the com-

plaint be dismissed as to all claims thus withdrawn. Hence only ten claims remain of the twenty-six originally in suit. The accused structures are automobile radio receiving sets manufactured and sold by defendant. Early in the litigation defendant voluntarily furnished plaintiff complete circuit diagrams of all its automobile receivers manufactured or sold during the thirty-five day period with which this litigation is concerned. These comprise nineteen different models. The accused coupling systems in defendant's broadcast receiving sets, here submitted for adjudication, are four in number:

1. The coupling system between the antenna circuit and the first adjustably-tunable selective circuit in the Buick receiving set model 1,304,873, Serial No. 336,483.

2. The interstage coupling system between the plate circuit of the first amplifier tube and the second adjustably-tunable selective circuit in the same Buick set.

3. The like interstage coupling system in the Chevrolet set model 985,253, Serial No. C1001.

4. The coupling system between the plate circuit and the adjustably-tunable resonant circuit connected to the grid of the heterodyne oscillator tube of the Chevrolet set.

### Invalidity.

The patent in suit is invalid for lack of invention.

The patent is directed simply to the use of two old coupling instrumentalities at the same time. The patent states that Figure 4, the preferred form, is simply the combination of magnetic coupling only with capacity coupling only. Both kinds of coupling, both separately and together, were old long prior to Trube in certain radio receiving sets. No invention was required to use both the practically available types of coupling at the same time, each old and each giving, independently of the other, its own well-known effect. All that was wanted was the sum of the individual effects. There was nothing novel or surprising in having the two kinds of coupling aid for greatest amplification.

The patent commences by saying that the alleged invention "relates to electric coupling systems particularly adapted for use with radio-frequency vacuum tube amplifiers". The only vacuum tubes described in the patent are of the "triode" type. Each comprises a grid, a plate and a filament. The physical proximity of the grid to the plate produces a substantial condenser. The high electrical pressure in the plate circuit caused a feedback through this grid-to-plate capacity of the tube. Such feedback produced regeneration. The energy was amplified and re-amplified by passing more than once through the tube which, if not controlled, might produce oscillations resulting in squeals, whistles and other undesirable noises.

To reduce the effects of such feedback, various systems of neutralization were proposed. They consisted in producing a neutralizing feedback from the plate circuit to the grid circuit, outside the tube. Two of these systems were those of Hartley and Rice, whose patents were sustained. A later one was that of Professor Hazeltine in the neutrodynes. His patents were also sustained. When Professor Hazeltine's "neutrodyne" patents were sustained, there came a reason for the use of a "double coupling". Trube, Wheeler and many other radio designers and engineers in different parts of the country, independently and almost simultaneously, applied the double coupling in order to avoid the Hazeltine patents. Hazeltine himself worked on double coupling about the same time.

Trube sought to develop an alternative way of overcoming the same effects of the grid-to-plate capacity feedback existing in the triodes. His object was to develop a radio receiver which would be highly sensitive and highly selective and also stable without neutralization and without infringing Professor Hazeltine's patents.

Trube was at that time a very young and inexperienced man, a few years out of college, and went to his former teacher, Professor Hazeltine, for help in preparing his patent application. Professor Hazeltine, an experienced mathematician, helped Trube in working out a scientific explanation of the simple facts which Trube had observed.

Only two kinds of coupling were practically available—magnetic and capacity. Magnetic gave an amplification which increased too fast. Capacity gave one which decreased too fast. Trube's whole patent, as regards the claims now remaining in suit, uses both kinds of coupling together to average up the results of using each by itself. Under whatever formula of scientific sounding words, it is still no more than the simultaneous use of two kinds of coupling, which were previously known and used both individually and together, for the

identical purpose of getting the "algebraic sum" of their several effects. There is no evidence that Trube had any difficulty in combining the two things, or in deciding to try the double coupling. There is lack of invention when it is shown that the same idea occurred independently, about · the same time, to ten or a dozen different engineers or designers, both before and after Trube's filing date.

The "difficulty" arose out of the fact that the patents of Hazeltine, Hartley and Rice were barring the way to the use of anything that neutralized the feedback. The whole art with one accord went to "double coupling" which would avoid the creation of feedback sufficient to cause oscillation of a "triode". In other words, to avoid the Hazeltine patents, Trube and a host of others hit upon a noninfringing means embodying the "double coupling" idea for accomplishing the same result as the neutrodyne. Engineers of the Hazeltine laboratory worked out what resulted in the same invention as that of Trube. Plaintiff found that Trube was prior to Wheeler. Upon Professor Hazeltine's advice plaintiff bought out Trube early in 1926 to complete its patent position on the neutrodyne patent. Trube's filing date was March, 1925. The dates of the contemporaneous independent development are shown by the filing dates of the patents and applications:

| Application Date | Patentee | Number |
| --- | --- | --- |
| Feb. 2, 1925 | Kolster | 2,089,270 |
| Aug. 11, 1925 | White | 1,780,611 |
| Aug. 8, 1925 | White | 2,152,448 |
| Aug. 26, 1925 | Kolster | 2,089,271 |
| Dec. 24, 1925 | Loftin | 1,686,755 |
| Sept. 2, 1926 | Roberts | 2,159,944 |
| Nov. 30, 1926 | Beers | 1,907,478 |
| Oct. 25, 1927 | Daley | 2,158,961 |
| May 17, 1928 | Landon | 2,050,343 |

| | |
| --- | --- |
| June 19, 1925 | A. J. Haynes Publication |
| May 10, 1925 | A. J. Haynes Publication |
| Nov. 1925 | A. J. Haynes Publication |
| Nov. 24, 1926 | Greeley abandoned application |
| Feb. 2, 1927 | Lippincott abandoned application |

In the radio art respecting patents, having earlier dates than Trube, it has been held that the standard required in order that the subject matter should amount to invention is a high one. Thus as to seven radio patents, the earliest of which was applied for in 1922, and others from 1925 onwards, the Second Circuit Court of Appeals said: "Many patents have been issued in this well-developed field, and, as indicated by the date of their issuance, all are of recent grants. Since the radio art was well developed, the standard of inventive thought to sustain a patent radio tube or circuit necessarily is higher than in the earlier history of the art." (Citing cases) Technidyne Corporation v. McPhilben-Keator, 2 Cir., 72 F.2d 242, 243.

The fact that there were a number of applicants for patents is well-nigh conclusive that "the idea was not the original act of an individual inventor but the simultaneous solution of half a dozen mechanical improvers, so making the alleged invention nothing but the natural advance of the art herein involved." Julius Kayser & Co. v. Rosedale Knitting Co., 3 Cir., 98 F. 2d 839, 840, certiorari denied, 305 U.S. 649, 59 S.Ct. 230, 83 L.Ed. 419.

The doctrine is not unique in the Third Circuit but is well established in the law: "The absence of invention may be established in some cases, by evidence that a considerable number of persons who were not inventors, acting independently of each other, and without receiving any information from the patentee or his patent did in fact contrive the improvement claimed therein, not long after he produced it." (Citing cases) Walker on Patents, Deller's Edition, Vol. 1, Sec. 27, p. 142.

The above rule was recently applied by the Supreme Court in the case of "independent patent application" filed by the patentee "and several others"; "The adaptation independently made by engineers and builders of these familiar appliances to the movement and distribution of concrete cement in building operations and the independent patent applications, within a comparatively short space of time, for devices for that purpose are in themselves persuasive evidence that this use, in combination of well known mechanical elements was the product only of ordinary mechanical or engineering skill and not of inventive genius. Atlantic Works v. Brady, 107 U.S. 192, 2 S.Ct. 225, 27 L.Ed. 438." Concrete Appliances Co. v. Gomery, 269 U.S. 177, 185, 46 S.Ct. 42, 45, 70 L.Ed. 222.

This rule is also well established in the various circuits. Wenborne-Karpen Dryer Co. v. Cutler Dry Kiln Co., 2 Cir., 290 F.

625, 628; Detroit Gasket & Mfg. Co. v. Fitzgerald Mfg. Co., 2 Cir., 89 F.2d 178, 181; Elliott & Co. v. Youngstown Car Mfg. Co., 3 Cir., 181 F. 345, 349. Phoenix Knitting Works et al. v. Rich et al., C.C. Ohio, 194 F. 721, 725.

The cases show that it is immaterial that the independent developers regarded their achievements as patentable and filed applications and became involved in interferences in the patent office. Here there were numerous applications in the year or two after the demand arose for avoiding the neutralizing patents with numerous interferences in the patent office. Some were won by Trube and some by others. This spontaneous development deprives the Trube patent of patentable invention even if that was not clear from other facts in the case.

### Prior Art.

■ The prior art is relied upon as a complete anticipation as well as showing a complete absence of invention.

The Morecroft book of 1921 is a well-known textbook on the "Principles of Radio Communication". It discloses such coupling systems as are used in radio frequency tuned circuits. It shows the use of combined or "compound" magnetic and capacity coupling in such circuits, employed in either aiding or opposing phase as desired; and says that "In certain radio receiving sets combined capacitive and inductive couplings are used." "Combined" and "compound" mean the same thing with reference to such couplings.

The King article of 1923, published in the Bell System Technical Journal, shows and teaches the use of "compound coupling" for both radio and audio frequency amplifiers, both in adjustably-tuned, sharply-resonant amplifiers and in more broadly tuned amplifiers. Both types of amplifier were well known long before Trube, and the difference between them is only one of degree. King teaches that the combined ·couplings may be in aiding or opposing phase, by means of fixed elements, and that for greatest amplification they should aid.

The Friis & Jensen article in the Bell System Technical Journal, published in April, 1924, teaches the use of inductive coupling alone and of capacity coupling alone, each into an adjustably-tuned, sharply-resonant secondary circuit. The article goes on to disclose and teach the use of such couplings together, in aiding phase, and for use both in broadly-tuned amplifiers and in adjustably-tuned, sharply-resonant amplifiers, such as are shown in the patent in suit. "Compound" capacitive and inductive coupling, in aiding phase, by means of fixed elements, and into an adjustably-tuned, sharply-resonant secondary circuit, is clearly disclosed and taught in this article. The article also discloses the use of distributed capacity between the already magnetically coupled primary and secondary coils of a radio frequency coupling system, such as defendant is accused of using, and thus justifies the defendant's accused constructions.

The Friis & Jensen patents No. 1,727,-010 and No. 1,859,867 disclose, and were embodied in, some seventy practical radio receiving sets manufactured by the Western Electric Company and used for monitoring radio broadcasting stations. It was admitted by Jensen, one of the patentees of these two patents, that those receivers embodied radio frequency coupling systems having substantially uniform amplification over a wide band of frequencies, which was obtained by providing combined or compound capacity and inductive couplings in proper proportion and in aiding phase.

The Trube patent No. 1,762,431 is prior art to the patent in suit and shows a coupling system using capacity coupling alone. This is in all material respects the same as Figure 3 of the patent in suit which plaintiff's expert admits to be an embodiment of Trube's alleged invention.

The Reeves article in the Wireless World & Radio Review, June 17, 1922, shows the use of a "pigtail" or "distributed capacity" connection for securing capacity coupling between magnetically coupled primary and secondary coils, and justifies defendant's use of its accused "pigtail" connections. In Reeves there is both inductive and capacity coupling, from a primary circuit into an adjustably-tuned, sharply-resonant secondary circuit, but the capacity coupling is in opposing phase to the inductive coupling.

The Alexanderson patent, No. 1,173,079, shows tuned radio frequency amplification such as is disclosed in the patent in suit by means of inductive coupling into an adjustably-tuned, sharply-resonant secondary circuit. This is similar to Figures 1 and 2 of the patent in suit.

The Armstrong patent No. 1,342,885 shows the "superheterodyne" circuit which defendant uses. The patent has now expired but defendant was licensed under it, as under the Alexanderson and other pat-

ents. It was admitted by Professor Hazeltine that Armstrong had used inductive and capacity coupling together, even earlier than 1918, both for the purpose of producing oscillations and for the purpose of controlling them.

Whittle patent No. 1,625,840 shows both anticipation and lack of invention. It shows compound capacitive and inductive coupling, by means of fixed elements, in aiding phase, for the purpose of securing a uniform response over a wide range of frequencies.

Batsel patent No. 1,709,651 is prior art, dating from 1923, and 'is available to show both anticipation and lack of invention. It discloses and teaches the use of a "high inductance" primary coil, shown in Fig. 1 of Batsel. This is the design which is used by defendant in all its accused radio frequency coupling systems. It is nowhere disclosed or suggested in the Trube patent in suit. Batsel specifically discloses a capacity across his primary coil for tuning the coil to resonance below the broadcast band of frequencies to be received. Plaintiff's expert, under cross-examination, admitted that just such an arrangement as is disclosed in the Batsel patent is within the patent in suit. Batsel also discloses distributed capacity between the primary and secondary coils, and in that respect, also, justifies defendant's accused constructions. If any of the defendant's accused radio frequency coupling systems were held to be within the Trube patent, Batsel would necessarily be a full anticipation.

German patent No. 365,606 of 1922 teaches that a tube and its coupling system having a characteristic which inherently varies in one direction with varying frequency may be combined, if desired, with a coupling system having, inherently, an opposite variation, to produce a result which is substantially uniform as the frequency changes. In this respect it teaches the whole principle and result of the "compound coupling" system asserted for the patent in suit.

## Infringement.

Defendant's accused receivers do not infringe the patent in suit. Defendant's accused "radio frequency" coupling systems behave in the opposite way from the disclosure of the patent in suit and are "just the opposite of what Trube wanted". Defendant's radio frequency couplings are all of the "high inductance" primary type like the Batsel patent in which the response due to the primary coil alone, with the distributed capacity across it, decreases with increasing frequency. This is the opposite of Trube's inductive coupling, which increases with increasing frequency. In defendant's radio frequency coupling systems the response due to the "pigtail" capacity between the primary and secondary coils increases with increasing frequency. This also acts in the opposite way from Trube's capacity coupling and is "just the opposite of what Trube wanted". Defendant's accused oscillator couplings generate oscillations. This also is the opposite of what the patent teaches. An object of the patent in suit and a feature of the alleged invention is to prevent oscillations.

The court finds:

1. The patent in suit is invalid because it does not disclose invention.

2. The patent in suit is invalid because it is anticipated by the prior art.

3. The defense of noninfringement is sustained as to each of the claims remaining in suit.

4. Plaintiff has consented that the complaint be dismissed as to all but the ten claims remaining in suit.

5. The complaint must be dismissed as to the ten claims remaining in suit.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

An order may be submitted.