SIPP ELECTRIC & MACHINE CO. v. ATWOOD-MORRISON CO.

(Circuit Court of Appeals, Third Circuit. January 2, 1906.)

No. 32.

1. PATENTS—PRIOR USE—EVIDENCE TO ESTABLISH.
  There is no hard and fast rule as to the measure or kind of proof required to establish prior use of a patented device, further than that it must be clear and satisfactory to the judicial mind in each case.
  [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 78, 104.]

2. SAME—SWIFT BRACKET FOR WINDING MACHINES.
  The Morrison patent, No. 729,084, for an improvement in brackets for supporting swifts or reels in a winding machine which consists in making the bracket adjustable by uniting the arm to the base, by a pivot and clamp, is void for anticipation, prior use, and lack of patentable invention.

Appeal from the Circuit Court of the United States for the District of New Jersey.

For opinion below, see 136 Fed. 859.

Edward Q. Keasbey, for appellant.
Charles Neave, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This is an appeal from an interlocutory decree sustaining the validity of the patent, No. 729,084, issued to Walter G. Morrison, for an alleged improvement in swift brackets for supporting swifts or reels on a winding frame. There was no question in the court below in regard to infringement, the contest being over the validity of the complainant's patent. The defendant contended that, in view of the state of the art, complainant's device was invalid for lack of invention, and that it was not a patentable combination, but only an aggregation of familiar devices which had been previously applied to the same and similar purpose, and which as a whole had also been in prior use.

The patent in suit relates to the art of winding silk, cotton, or other threads from large reels onto spools or bobbins. The skein of silk is placed upon the swift or reel, which is a device having two sets of long arms radiating from a hub; pieces of string are looped around each two opposite arms and the skein of silk is slipped over the strings, which are then slid upward on the arms so as to hold the skein extended. There is a pin projecting from each end of the hub of the swift, and these pins rest on bearings in the outer end of brackets mounted upon a rail running lengthwise of the machine. There are generally a

number of brackets upon the rail and each bracket may support an end of two adjacent swifts, as illustrated in the drawing of a winding machine offered in evidence and here reproduced.

In the upper part of the winding frame is a row of spools or bobbins, on which the silk is to be wound from the swifts, there being one spool above each swift. Each of these spools is revolved by power, so that if the end of the skein on the end of the swift is fastened to the spool, the spool in revolving will wind the silk on it, and by the pull of the silk thread the swift will revolve as the silk is wound off.

The alleged invention relates to the brackets used in a winding fame for supporting the axles of swifts. These brackets are set up at regular intervals along the rail, extending therefrom at an angle more or less acute with a line perpendicular to the horizontal rail. They consist of iron arms 12 to 15 inches in length, with bases constructed so as to be attached to the rail by bolts or screws. At the outer end of the arms are sockets for holding the trunions of adjacent swifts. The specifications of the patent say:

"As commonly used, the brackets supporting the swifts are rigid and not capable of adjustment, while the conditions of use require a vertical change of position of the swift, in order to obtain the best results."

To this end, the bracket arm is no longer made integral with its base, but is united to a suitable projection from the base by a bolt and nut, which serves as a clamp. The bracket can thus be raised or lowered at its outer end upon the bolt as a pivot, and may be secured in any required position by the nut, set screw, or other clamp. In addition to this vertical adjustability, the bracket may be laterally adjusted by means of a slot in the rail, as described in the specifications and draw-

ings of the patent in suit, or otherwise, as by turning the holes provided for the screws which fasten the base to the rails into a slot, which, by the loosening of the screws, will admit of a slight but sufficient lateral movement of the bracket along the rail. There are five claims in the patent. Those relied upon by the complainant are the first, second, and fourth, which are as follows:

"(1) In combination in a winding frame, a swift supporting rail, a plural number of bases adapted to be secured to the rail, a swift-arm pivoted to each base at or near the rail, each arm having on its outer end means for supporting the ends of two adjacent swifts, and means for locking each arm against pivotal movement.

"(2) In combination with a winding frame, a swift-supporting rail, a plural number of bases adapted to be secured to the rail and having means of adjustment lengthwise of the rail, a swift-supporting arm pivoted to each base at or near the rail, each arm having at its outer end means for supporting the ends of two adjacent swifts and means for locking the arm against pivotal movement."

"(4) In combination in a winding frame, a swift-supporting rail, a series of two or more bases adjustably mounted upon the rail, a swift-supporting arm pivoted to each base at or near the rail, each arm having at its outer end recessed pockets on opposite sides to receive the swift-bearing of the ends of two adjacent swifts, and means for preventing pivotal movements of the swift-arm."

The patentee in his specifications, in describing his invention, after stating that such brackets, as commonly used, are rigid and incapable of adjustment, and that the conditions of use require a vertical change of position in the swift, says:

"To this end, my invention consists in the sectional bracket, the sectional clamp and means of securing the bracket to the rail of a winding frame and the combination of the several parts making up the device as a whole, as hereinafter described and more particularly pointed out in the claims."

It is not denied that all the elements of this alleged combination are old, and it is apparent from the patent, as well as abundantly clear from the evidence, that the real claim of invention is for the use of a pivot and clamp uniting the bracket arm to the base or for other familiar means of adjustment permitting the bracket to swing on a pivotal point, and for means of adjustment lengthwise of the rail, the locking of the bracket arm against pivotal movement being almost a necessary part of the means of pivotal movement itself. A description of this simple alleged improvement in connection with the several parts of a winding frame, as theretofore existing, gives no patentable character or value to the claims, unless it be such a combination of old elements, as achieves a new result in a new way. It is not perceived, either from the statement of the patent or from the evidence, that this has been accomplished.

According to the statement of the patentee in his specifications, the winding apparatus, as it existed prior to the patent, consisted of precisely the same parts as it did after the patent. Functionally, also, these parts were the same. "As commonly used, the brackets supporting the swifts are rigid and not capable of adjustment." It appears from the evidence that, in setting the swifts in position upon the ends of the brackets, the brackets were adjusted on the rail of the winding frame before fastening them rigidly thereto. It obviously increased

the facility of so adjusting them to attach the bracket arm to the base by a pivot, allowing a swinging motion to the arm, which could be clamped in any position by a nut on the end of the pivot. The same results would be obtained by the adjustment of the rigid arm in proper position before fastening the base to the rail. In his letter to the Commissioner, after repeated rejections of his claims, the applicant declared that:

"The applicant's joint is provided for the purpose of facilitating the setting up of the machine. It is not intended for use in the operation of running the machine to any extent whatsoever, and for this reason differs from the other devices of the prior art."

It is claimed for the patented device in the argument, that its great purpose was to facilitate the securing of perfect alignment of the axes of the swifts, but this purpose is included in the general purpose of facilitating the setting up of the machines. The addition of such an improvement in facility of adjustment to the swift-supporting brackets of a winding machine, produces its own result, without joint or cooperating action of the other parts of the machine. It will not suffice to describe the addition of this element as being in combination with the other elements or parts of the machine, in order to make a patentable combination. It is an aggregation of elements, not a combination, and the alleged new feature in such aggregation must stand on its own merits as being novel and patentable. Our opinion accords with that of witnesses for the defendant below, who testify that the facility of adjustment to be obtained, by uniting the bracket arm to the base with a pivot and clamp, would be an obvious suggestion to a skilled mechanic. To give a swing to a bracket or bracket arm by means of a pivot at one end thereof, and to maintain rigid position by clamping, by means of a nut on the end of the pivot, is the commonest of mechanical devices to accomplish purposes for which such swinging motion is necessary. The same may also be said of a slot, whether in the rail or the base, to permit of a limited lateral motion. We are not surprised, therefore, that the evidence discloses that just such means had been previously employed to accomplish the same or analogous results.

In a patent issued to one Atkinson, in 1873, for certain improvements in bobbin winding machines, we find set forth in the specifications and drawings a pivoted arm for the support of adjacent swifts. It is true, that the use of what is called a swift in this patent is different from that of the swift in the patent in suit; but, as said by the counsel for the appellant, this patent shows that when pivotal movement was required, a pivot was placed in the arm that was used for support of adjacent reels on a winding frame. In 1883, a patent was issued to one Wrigley, for a new "and useful improvement in machines for winding silk, thread," etc. In his specifications, the patentee says:

"The object of my invention is to produce a device which will hold securely to their several positions the frames in which are journaled the lower reels on winding machines which will be hereinafter more fully explained."

This explanation shows, among other things, a bifurcated bracket, in the ends of the two arms of which are sockets for supporting a reel

over which a skein or hank of silk or thread passes to another reel rigidly fixed to a rail above that to which the bifurcated brackets are pivotally fixed. A spring encircles the pivotal head of the bracket arm, and by its pressure furnishes means for preventing unintended pivotal movement. A skein is stretched from the lower reel to the upper rigidly placed reel, and the thread passes to a spool or bobbin above them both, and is wound around the same. The pull on the thread, as it is wound on the bobbin, causes the reels holding the skein to revolve. One arm of the bifurcated bracket extends beyond the reel and serves as a handle by which it may be raised or lowered to increase or diminish, as required, the tension of the skein while the machine is in operation. The force applied to the handle overcomes the pressure of the spring on the pivot, which however sufficiently clamps the same when the moving force is discontinued at the handle. The purpose of the winding machine of this patent is somewhat different from that of the patent in suit. The reels in this patent are called risers and not swifts. With a swift, the skein is not stretched between two reels, one swift holding the entire skein. These and other differences between the device of this patent and that of the patent in suit, are pointed out and relied upon by the counsel for the appellee, and by the court below, as showing that the Wrigley patent is irrelevant as evidence of anticipation. We are of opinion, however, that both the Wrigley and Atkinson patents set forth and describe a pivoted bracket, so similar in function and application as to clearly anticipate the device of the patent in suit. The differences pointed out are immaterial, as regards the question of anticipation. The principle of operation is the same in both cases. The arts were clearly analogous, if not the same, and the purpose and result of the combination, to wit, adjustable movement of the reels, supported on the ends of the brackets, were identical.

The dividing web at the end of the bracket arms, to separate the sockets for the trunions of adjoining swifts, is characteristic of the brackets in their rigid position, as described in the prior art. The Atwood patent, in 1882, for certain useful improvements in machines for winding silk, says:

"The object of my invention is to enable the bars to which the hangers for swifts are attached, to be adjusted inward to economize space when small swifts are being wound from, and at the same time and simultaneously to be adjusted upward, so as to bring the portion of the swifts which the attendant has most to reach always at about the same height and position."

According to the testimony of the expert witness, J. Irving Terhune, the drawings in this patent, as well as the specifications, show sockets so arranged on the ends of the arms as to hold the bearings of adjacent swifts. The drawings also show a web or dividing space between the pockets or recesses on opposite sides of the outer end of the bracket separating the adjacent swift bearings.

In addition to these patents, testimony was adduced, showing anticipatory use of the pivotal bracket in precisely the same kind of combination as is claimed in the patent in suit. There are two or more witnesses who testify to this previous use. There can be no doubt that the prior use, as testified to, clearly anticipates the pivotal adjustable bracket, with means for lateral adjustment on the rail and means

for supporting the ends of two adjacent swifts, and means for locking each arm against pivotal movement, separately or in combination, as described and claimed in the patent in suit. This is not seriously contested by the appellee, whose principal, if not sole, contention is, that the evidence as to the alleged prior uses of the patented device is insufficient to defeat the patent. In support of this contention, the appellees quote the oft-repeated declarations of courts, that the burden of proof as to prior use rests upon the defendant, and that every reasonable doubt should be resolved against him, and that courts require that the proof of prior use shall be clear and satisfactory. It is undoubtedly the duty of courts to exercise, as in nearly all cases they are careful to declare, the utmost caution in scrutinizing and considering the testimony offered to establish a prior use. Courts have frequently taken the ground, under the particular circumstances of the case before them, that where a long time has elapsed since the alleged use, and the fact depends upon the fading recollection of a single witness, that an exhibit of the device or thing actually used must accompany the affidavit. There is, however, no hard and fast rule as to this. In this, as in other cases, the weight and effect of testimony must be passed upon, and a conclusion as to the existence of an alleged prior use will be reached if the evidence thereof is clear and satisfactory to the judicial mind.

In the present case, we see no reason to doubt the testimony as to these alleged prior uses. The witnesses are shown to be men of experience and intelligence and there is no impeachment of their character. Their familiarity with the art and industry to which the patent in suit relates, is abundantly established. No bias or pecuniary interest is shown to qualify the force of their testimony. The time that has elapsed since the date of the facts testified to was not great,—ten or twelve years. The witnesses were in the prime of life, and their testimony direct, positive and distinct as to the facts testified to. Seven exhibits of brackets were produced by them to illustrate the art as they knew it to exist. All but one of them were reproductions made for purposes of illustration. They are, however, so simple in character that it is impossible to believe that an ordinarily intelligent man could be mistaken as to their exact form and function. One of them is testified to by Terhune, engaged for 20 years or more in manufacturing textile machinery, which includes winders and swifts, as having been actually used upon a winding machine manufactured for a customer.

Terhune also testifies that in 1892 he built a machine for the Saxonia Manufacturing Company, with a single arm bracket to support arms of adjacent swifts, and providing each of the arms with a pivot and clamp at or near the base. He did this by cutting the arm of the old bracket, overlapping the ends and fastening them together with a bolt and nut. He gives this transaction in detail with a clearness of recollection that does not admit of doubt as to the truth of his statements. In speaking of the locking device, he says it was a thumb screw or a thumb nut, and that the difference between a thumb nut and a clamp nut is, that the thumb nut is tightened by hand, and a clamp nut is tightened by a wrench. The lateral adjustment necessary in this par-

ticular case, he says, "I obtained by removing one of the two screws in the base and loosening the other." This bracket is not to be distinguished in principle of construction, however rude and provisional it may be, from that of the patent in suit. We have in it the pivot and clamp, giving the swinging motion to the brackets, which were used for the support of adjacent swifts. The simplicity of the suggestion of a swinging pivoted bracket, with a clamp nut in the pivot, to meet the requirements of the situation described, the circumstantial statement of time, place and manner of construction, taken together with the unassailed veracity of the witness and the distinct and positive character of his testimony as to details, unite to form that high degree of probability which amounts to satisfactory proof.

We do not fail to appreciate the value of the declaration so often made by courts, to the effect that the simplicity of the device or process claimed in the patent should not militate against its patentability, or that because the thing seem so simple after it is once done or discovered, is no reason for denying the exercise of the inventive faculty, in respect thereto, to the one who first does or discovers the process or the device. These cautions are founded on common sense and are proper and necessary to be kept in mind in the consideration and discussion of all questions of patentable invention, but they must not be allowed to absolutely control the judgment, where common sense leads to a different conclusion.

In connection with this, as well as with the points made by the appellees, and already discussed in reference to the burden of proof, and the prima facies of the patent itself, as evidence of patentability, it is interesting to turn to the history of this patent, as disclosed in the file wrapper. Application for the patent was filed June 14, 1896, together with specifications and drawings. These specifications and the claims founded upon them do not, in our opinion, substantially differ in the principle of the construction and combination they describe and set out, from those contained in the letters patent now before us. The 11 claims set out in the first application are all rejected by the Commissioner of Patents on the report of the examiner. Claims 1, 2, 3 and 4 are rejected upon either of the patents to Wrigley or Atkinson, above referred to; claims 5 and 6 are rejected upon the patents to Betz and Wrigley; claim 7 is rejected upon the patent to Wrigley; claim 8 upon the patent to Sweet; claim 9 is said to be aggregational and is rejected upon the Betz patent; and claims 10 and 11 are rejected upon the patent to Wrigley. A correspondence between the patent solicitors and the Patent Office thereupon ensues, in which various amendments are suggested to the claims. February 16, 1897, a letter from the Patent Office states the rejection of the amended claims, which have been reduced to 5 in number, upon substantially the same grounds as stated in the former letter of the Commissioner. Further amendments are made by the Solicitors for the patent, in a letter of July 29, 1897, which are again rejected August 24, 1897, by the Patent Office, on the patent to Atwood above referred to. On November 29, 1898, a long, argumentative letter is addressed by the patent attorneys to the Patent Office, suggesting various amendments, and combating the merit of the references made theretofore by

the examiner. To this letter, there is a reply December 8, 1898, by the Commissioner, in which the same examiner, as before, discusses the merits of the suggested claims, which he rejects, on the general grounds before stated. The letter closes as follows: "If applicant so desires, he may consider this rejection final." On August 5, 1901, a new examiner takes up the case, and after considering the applicant's argument, says:

"No reason is seen for changing the office actions previously made in this case, denying patentability for the mode of supporting the reel by a separate arm having separate means of adjustment. Adjustable arms for reels have been shown to be old in the patents to Wrigley and Atkinson on record. It makes no difference that these patents show only a single arm holding the reel. The mere duplication of this adjustment is held not to be patentable, especially in view of the fact that separately adjustable arms for exactly analogous devices are shown to be old in the references previously cited."

July 11, 1899, there is another long and argumentative letter from the patent attorney, and on July 23, 1901, from the administrator of the estate of Morrison, by his attorney, and on February 14, 1903, a letter from Walter G. Morrison, by other attorneys. No specific replies to any of these letters are disclosed by the file wrapper, but there appears a letter dated April 25, 1903, from the Commissioner of Patents, stating, but giving no reasons therefor, that the application has been examined and allowed.

Of course there is the inference that may be made from this long correspondence and its result, that the patent, having been granted only after repeated rejections, has had the benefit of a most thorough and exhaustive examination. On the other hand, however, we must not overlook the effect of importunity and persistence, nor fail to appreciate the value which judgments at first blush often have over those which are produced by an elaborate casuistry. The grounds of these repeated rejections by the different examiners who have considered the application and the specifications and claims, as from time to time amended, accord with our judgment and support the views we have herein expressed. On the whole, we are of opinion that the alleged combination of the patent in suit is not patentable, as such, but is merely an aggregation of the elements described, that the particular device of the patent in suit did not involve patentable invention, and that moreover, the prior uses testified to actually existed in the prior art.

The judgment below must therefore be reversed, and the record will be remanded, with instructions to dismiss the bill.