VIRGINIA-CAROLINA PEANUT PICKER CO., Inc., v. BENTHALL MACH. CO., Inc.*

(Circuit Court of Appeals, Fourth Circuit. November 23, 1916.)

No. 1440.

1. PATENTS ⬦75—VALIDITY—PRIOR USE.
    The prior public use of an invention for two years invalidates a later patent, even though the patentee had no knowledge of the same.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97.]

2. PATENTS ⬦328—PRIOR PUBLIC USE—PEANUT STEMMING MACHINE.
    The Benthall patent, No. 890,401, for a peanut stemming machine, *held* void for prior public use for more than two years before the appli-

---

cation of a machine invented and constructed by Ben Hicks which embodied all the principles of the patented machine.

3. PATENTS ⊜87—ABANDONMENT OF INVENTION—BURDEN AND MEASURE OF PROOF.

Where an invention has been embodied in a successfully operating machine, its abandonment will not be presumed, but must be established by clear and convincing evidence beyond doubt.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 112.]

4. PATENTS ⊜30(1)—INVENTION—MECHANICAL IMPERFECTIONS.

Mechanical perfection in a machine is not necessary to sustain invention, provided it discloses the principles upon which it may be practically operated.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 34.]

5. PATENTS ⊜328—VALIDITY—PEANUT PICKING MACHINE—ANTICIPATION.

The Ferguson & Benthall patent, No. 808,442, for a peanut picking machine, *held* anticipated and void for prior public use for more than two years of a machine invented and constructed by Ben Hicks.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in equity by the Benthall Machine Company, Incorporated, against the Virginia-Carolina Peanut Picker Company, Incorporated. Decree for complainant, and defendant appeals. Reversed.

For opinion below, see 222 Fed. 918.

Menalcus Lankford, of Norfolk, Va., Lee Britt, of Suffolk, Va., and Harry K. Wolcott, of Norfolk, Va. (Wolcott, Wolcott, Lankford & Kear, of Norfolk, Va., on the brief), for appellant.

T. Hart Anderson, of New York City (Munn & Munn, of New York City, and Tazewell Taylor, of Norfolk, Va., on the brief) for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge.   The Benthall Machine Company, a corporation doing business in the city of Suffolk, Va., instituted suit in the District Court of the United States for the Eastern District of Virginia on August 7, 1912, against the Virginia-Carolina Peanut Picker Company, a ·corporation.   The bill alleges infringement of certain claims of its peanut picking patent and peanut stemming patent, combined in a machine known as the Benthall machine.   The appellee will hereinafter be·referred to as complainant, and the appellant as defendant, such being the respective positions occupied by the parties in the court below.

The court below decreed in favor of complainant, and entered a perpetual injunction against the defendant restraining it from using any "peanut picking machines or any peanut stemming machines embodying the invention as set out in claim 1 of said letters patent No. 808,442, and as to claims 1 and 3 of said letters patent No. 890,-401. * * *"   This case comes here on appeal in pursuance of section 129 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1134 [Comp. St. 1913, § 1121]).

The Benthall Machine Company is the owner of two patents combined in their machine known as the Benthall machine.   The first pat-

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ent is for a peanut picking machine designed to separate the peanuts from the vines to which is attached a slender tendril known as the stem. This patent is known as the Ferguson & Benthall patent, issued to F. F. Ferguson and J. T. Benthall on December 26, 1905, and later acquired by the Benthall Company. The second machine is known as a peanut stemmer, designed to separate the slender tendril or stem from the nut. The patent was issued to Jessie T. Benthall on this machine June 9, 1908, and later acquired by the Benthall Company.

We will first consider the Benthall patent, which, as we have stated, is for a peanut stemmer. It is insisted by defendant that this patent is invalid in that it was shown that there had been a prior use of what is known as the Ben Hicks machine.

There were some very interesting historical facts developed in the discussion of this case. While it is not at all material to a determination of the question now before us, nevertheless it is interesting to note that peanuts were first brought to this country by negro slaves, and for a number of years this product was considered of no value, being only grown and eaten by them. However, in the course of time the white people began to appreciate the merits of the peanut, and finally through candy and fruit venders they were roasted and sold in almost every section, and in this way the demand for peanuts became so great that it is now one of the great industries of the South, and used for many purposes, such as peanut butter, peanut brittle, roasted and salted peanuts, etc. Among other things, it is contended by counsel for complainant that:

"The production of peanuts throughout the state of Virginia, and other Southern states has constantly increased, so that now it constitutes a large and growing industry, and the demand for your orator's machines is large and is constantly increasing, so that your orator will realize and receive large gains, and constantly increasing profits therefrom if infringement by said defendant and others shall be prevented."

The inventor of what is known as the Ben Hicks machine is an old colored man by the name of Ben Hicks, residing on a farm in Southampton county, Va., near Suffolk. It was stated in the argument that this old colored man was also first to invent a peanut planter, which is in use to-day. Hicks is a man of fine native intellect and mechanical genius, but possesses no education, and one who reads his testimony might get the impression that he is a very ignorant negro, and this is undoubtedly true in so far as a knowledge of books is concerned. Living in a section where peanuts were grown to a great extent, and, being engaged in the cultivation of the same, he no doubt appreciated the importance of a machine that would separate the peanuts from the vines. It is insisted by defendant that it has established the fact that this old negro was the first to evolve the principle upon which a peanut picking machine could be constructed; that in the year 1900 he constructed and used a peanut picking and stemming machine which embodies in detail every principle as shown in the alleged infringing machine of the defendant; that this fact was established by the testimony of many credible witnesses, and is uncontradicted; that on the 10th day of December, 1901, Ben Hicks secured a patent on his machine which embodies every detail of the Benthall patent save two:

(1) The saw, on which no infringement is claimed; and (2) the vibration of the stemmer, on which infringement is claimed. Indeed, this is the chief point in controversy.

The defendant says that it attaches no particular importance to this patent as to the prior art, "and claims no rights under it other than the evidence it offers as to the construction of certain elements which it plainly shows of the original Ben Hicks machine." It is insisted that an examination of the patent itself will show every feature of the machine upon which Benthal secured a patent eight years after the patent (save that of the movement or vibration) had been granted to Ben Hicks. The evidence is silent as to why Ben Hicks at the time he secured his patent in 1901 omitted this feature, but when we take into consideration the fact that Ben Hicks could neither read nor write, and therefore had to rely upon the patent attorney, who prepared the application for him, we can well see how a mistake of this kind could have occurred. The following is taken from the testimony of Ben Hicks:

"Q. Ben, can you read? A. No, sir. Q. Can you understand mechanical drawings? A. No, sir. Q. Do you know what was in the patent that you have spoken of? A. No, sir; I can't tell you."

It would not be an easy task for even a well-educated layman to give an accurate description in detail of a piece of complicated machinery so as to convey to another an intelligent idea as to its construction and the principle upon which a claim for patent is made. When we consider the fact that Ben Hicks, as we have already stated, was uneducated, and therefore unable to describe with accuracy the mechanism of the invention which he had evolved in his own mind, we marvel that his attorney secured even the information he did upon which to base an application for the patent in question, and, further, we should consider the fact that all general practitioners at times are liable to make mistakes of this character, and we are sure that a patent attorney is not exempt from this human frailty. Therefore it may be that the mistake was due in part to the fault of the patent attorney. The theory that a mistake was made by some one is strengthened by the uncontradicted evidence of a number of witnesses who testified that the original machine, with the movement or vibration embraced therein, was used for a number of years publicly and practically; that Ben Hicks constructed and operated successfully the machine containing the principles of the Benthall patent; that this machine was built in 1900, and was used for the purpose of stemming peanuts until the year 1908. This fact is well established.

It is insisted by complainant that, inasmuch as the movement was left out of the patent, it was not, therefore, in the original machine. A number of witnesses were introduced who testified that Ben Hicks did not at any time have a stationary stemmer. Hicks, while testifying as to this point, said:

"Q. Did you ever use a stemmer with a stationary trough? A. A stationary trough; no, sir. Q. Did you ever use a stemmer that did not move? A. No, sir; I never used one that didn't move. The peas wouldn't come out."

However, it is insisted by counsel for complainant that Ben Hicks secured his ideas from the Benthall machine. In view of the fact that Hicks constructed his machine in 1900, which is established by the uncontradicted evidence of many witnesses, we must confess that we fail to appreciate the ground upon which this contention is, based. Hicks' testimony is corroborated by documentary evidence from the Patent Office to the effect that he made a machine in 1901 precisely like that of the Benthall patent except the movement therein. In addition we have the Hundley machine, constructed by Ben Hicks in 1901, which contains this movement. This machine was one of the exhibits introduced to which reference will be made later on in the opinion. The following evidence relating to the Ben Hicks machine was introduced in the court below:

Ben Hicks testified:

"Q. When did you first build that machine you have just pointed to? A. 1900. * * * Q. Is there anything you can say about the trough? A. Nothing no more'n de trough had swings, four little pieces, swung, so that it moved back and forth. Q. Are you sure the machine in 1900 had the trough on swings so that it would move back and forth? A. Yes, sir."

Witness J. T. Johnson also testified that he had seen the Hicks machine in 1900 or 1901:

"Q. How did the buying peanuts from this machine cause you to see the machine? A. The reason that I saw the machine the peanuts were so clean that I told Ben Hicks that I thought it was impossible to pick such peanuts so clean with a picker, without stems and, trash, and he told me that they were picked by the picker and were not repicked by hand. Well, it was a curiosity to see a machine that could pick peanuts at that time, so I went over to see the machine. Q. Did you see the machine operate to pick and stem peanuts? A. Yes, sir. Q. Please describe for us the operation of the machine built by Ben Hicks, which you saw in 1900 or 1901? A. * * * the canvas belting delivering the peanuts in the stemming trough, working crossways the machine in a trough like or box like concern shaking itself (indicating with hands back and forth movement), with strips of iron placed between small saws, the saws being between the grooves or strips, and the shaking motion rotating the peanuts in such a manner as to cut off the stems. * * * "

The testimony of Ben Hicks is corroborated by John White, a colored man, and landowner, who resided near Hicks and aided him in the construction of the machine. Junius F. Faircloth also testified that he saw Ben Hicks using a peanut stemmer at Ben Hicks' place in 1901:

"Q. You have indicated with your hands a movement when you referred to the stemmer. Was this stemmer stationary or did it move? A. It moved. Q. Where was this stemmer located with reference to the frame of the machine? A. In the rear end of the machine. Q. What was the direction of the movement of the stemmer which you have stated moved? A. It went crosswise the machine."

John L. Scott also testified that he saw Hicks using a peanut stemmer in 1902. Mr. Scott describes the stemmer of Ben Hicks' machine as follows:

"This belt ran and carried the peanuts over to a trough that was setting one end up a little beyond the other, a little higher across the machine at the

rear end. This trough was in motion backwards and forth that caused the peanuts to move about in the box. There was some little saws in there that ran on something like a shaft that sawed the stems off. That's all that I especially took notice of."

From the foregoing it clearly appears that the original Ben Hicks machine contained the movement in question, and this evidence is most strongly corroborated by the proof as to the John Hundley machine. This machine was constructed in 1901, under the immediate direction and supervision of Ben Hicks, and it is clearly established that the stemmer portion of this machine is similar to the stemmer portion of the Ben Hicks machine, the difference in the two machines relating to the picking arrangement, and the testimony showed that this device was constructed under the direction of Mr. Hundley so as to conform to his notion as to the proper mode of operating this particular part of the machine. We not only have the evidence of Hicks that this machine was built in 1901, and that it was capable of being successfully operated, but we have the evidence of a number of other witnesses in which it is stated that this machine was operated in 1901 and 1902, and contained a stemming device with saws operating between slats. It was also shown that it had a vibration or movement of the stemmer. It further appears that a number of this pattern were constructed and put into practical use. The one which was produced in court showed a stemmer precisely like that of the Ben Hicks machine.

The fact that Benthall, if such be the case, had no actual knowledge of the Ben Hicks machine, is controverted, but we deem this immaterial, because it is well settled that a knowledge of the existence of a machine in public use is presumed to all subsequent patentees. This is a salutary rule. Otherwise one who secures a patent or evolves a scheme by which he constructs a machine and puts the same into public and practical use would be at the mercy of any one who might see fit to make use of his ideas, and thereby deprive him of a right which, according to the rules of fair dealing, he would be entitled to enjoy. Bearing on this point defendant insists that it is significant that Benthall, who lived in an adjacent county some 25 miles distant from Hicks, should "invent a patent peanut stemming machine in 1908, without knowing of the Hicks machine, corresponding in every detail with the Hicks machine, which was made in 1900, and used continually thereafter until 1908."

Witness Bradshaw stated positively that the John Hundley machine was built at his home in 1902, it being the year in which Mr. Hundley died. A son of Hundleys testified that the John Hundley machine was successfully operated in 1902, just before the death of his father, which occurred on the 22d day of October of that year. The witness Howell testified that he helped build the Hundley machine, and, among other things, fixed the date by his marriage, which occurred in 1901. We quote the following from his testimony:

"Q. Please briefly describe the mechanisms of the peanut picker and stemmer which you say you worked on. A. Well, in this machine it had a drum on the top with teeth on it and teeth made out of iron or steel that hangs

down that the teeth on the drum runs through, and it had a wide belt with rivets through it that carried the vines into the drum, and it had also a fan that blowed the trash away; had a stemmer with saws, vibrating table; the stemmer vibrated, swung on hinges, riveted together."

A witness by the name of Thomas M. Lilliston, introduced by the Benthall Company, among other things, testified that he built the Hundley machine, and in constructing the stemmer he followed the instructions of Ben Hicks. He further stated that this machine was constructed in 1901, and said that the stemmer contained a shaking trough. He testified in part as follows:

"Q. Do you know and are you familiar with the machine that has been introduced in evidence here on behalf of the defendants as Defendant's Exhibit E3, Hundley machine? A. Well, I built the machine. Q. Do you mean that in building the Hundley machine you followed the construction of the stemming device which was in the machine that Ben Hicks brought to your place? A. Yes; so far as its principles were concerned. Q. Give us as good a description as you can of the stemming mechanism that was in that old machine. A. Well, it was a box or trough with a slatted bottom with gin saws between those slats, or course mounted on a shaft, which, as I recollect it, was run by a sprocket chain, and the trough did shake, but I can't remember the device that shook it; I can't remember. Q. Give us the date as near as you can when this old machine of Ben Hicks was sent to your place. A. It was in the winter of 1901, I think, in December I think is right. Q. Are you certain as to the year? A. I feel sure about that. Q. Was the operation of picking and stemming peanuts performed by these Hundley machines—I mean by that the four machines which you built, one of which is here in evidence as Defendant's Exhibit E3—was the work satisfactory? A. Yes. Q. Do you mean, Mr. Lilliston, that those machines did a good job of picking and stemming peanuts? A. I can think of only one other way of answering that question as I think satisfactory, and that is, the quality was very good. The quantity was not there. Q. Do you mean by your last answer that the machine was of small capacity, and that it was of such small capacity that you would not regard it as doing a good job of picking and stemming peanuts? A. Its capacity, in my opinion, has nothing to do with the quality of the work that it did do. The work it did was satisfactory. Q. What was its capacity? A. From 10 to 20 bags a day of ten hours."

We think the testimony establishes the fact beyond a reasonable doubt that the John Hundley machine had a slatted bottom stemming trough with saws extending through the slats and the stemming trough mounted to vibrate back and forth, and was in use in 1901, long before the Benthall patent in suit was applied for or granted. However, it is insisted by complainant that its device has a tendency to hasten the passage of the peanuts. This may be true, but in our opinion involves no invention. It is something that would have occurred to any skilled mechanic or even a layman. The evidence shows that the capacity of this machine was 10 to 20 bags of peanuts a day, and under these circumstances was a practical and useful machine, and could not be said to be a simple experiment.

However, it is insisted by the complainant that the Ben Hicks machine used as an exhibit had been made over to meet the facts of this case. This contention is unwarranted by the evidence, which is to the effect that in 1901, four years anterior to the time Benthall applied for a patent or made any machines, the patent was granted to Ben Hicks,

and this patent discloses a stemmer as it appears in the machine at this time with the exception of the movement. The fact that the Ben Hicks machine contained the movement is shown by a number of witnesses, as well as the production of the Hundley machine in precisely the condition in which it was built by Lilliston for Hundley in 1901.

The complainant further insists that since 1908 Hicks had discarded the old machine and had been using a new machine which he had purchased at that time from the defendant. It was shown by the testimony that the old machine, while embodying every feature contained in the Ben Hicks machine at this time, was constructed in a crude manner and had been thrown aside and exposed to the weather, and that some of the parts had rotted away, in consequence of which these parts had been renewed. It further appears that the renewed parts were painted yellow so as to enable one at a glance to distinguish the renewed parts from the original. Hicks, in testifying on this point, among other things, said:

"Q. Have you or have you not recently done any work on that machine? A. Yes, sir.  Q. What have you recently done to that machine?  A. Put on all that yaller work you see on dere, sir.  Q. Why did you recently put on these parts that are painted yellow on this machine?  A. The old part had rotted down, part of it, and we had to put on dis part.  Q. What did you put on these yellow parts for?  A. We put dese yaller parts on dere to show you how it was fust.  Q. Did some one help you put these yellow parts on?  A. Yes, sir: Mr. Little.  Q. What can you say about the parts that are not painted yellow on this machine?  A. I built that in 1900.  Q. Do you mean that you made the parts that are not painted yellow on this machine in 1900?  A. Yes, sir."

Witness Little, who reconstructed the Ben Hicks machine, testified as follows regarding this point:

"Q. Tell us about how these yellow parts came to be put on and just how and by whom you were instructed in putting them on.  A. Well, those new parts was rotten down, and when we brought the machines to the Virginia-Carolina Peanut Picker shops I had instructions from the company to take Ben Hicks to the factory and renew these old rotten down parts with new parts according to his instructions.  Now, while Ben Hicks was out of the shop I did put on sprocket wheels on the saw mandril and shaft that rotates the saw mandril and chain on same, but when Ben Hicks come back to the shop he told me it was not like it was in 1900; that he had pulleys made out of round poles about four inches in diameter on these mandrils and shafts with belt on same, with a tightener or idler in front of the back shaft or mandril.  Then I taken sprocket wheels and chain off and made pulleys out of round poles and put on mandrils and shaft that rotates the mandrils and belt on same, according to his instructions.  Q. Did you put any other parts on this machine while he was out of the shop?  A. No, sir.  Q. Who was around the factory other than yourself and Ben Hicks when you were working on this machine?  A. Nobody but Ben Hicks and I.  Q. Did or did not you put on any parts on this machine according to your own ideas?  A. I did not, with the exception of those sprocket wheels that I mentioned in answer to question 17.  Q. How about the parts on this machine as it now stands that are not painted or touched with yellow paint?  A. Those were on there when I brought the machine down here from Ben Hicks, with the exceptions of that feed box which was not on the machine, but put it on according to Ben's instructions, and he said it was put on in 1900.  Q. When was it that you were working on this machine under Ben Hicks' instructions?  A. Week before last.  Q. While you were working on this machine, did or did you not

bore any holes through the old parts which are not painted yellow? A. I bored one hole in the right-hand post and front of machine to strengthen post, as post was decayed or rotten and would not hold bolts for boxes. That's the only hole I bored in the old parts. Q. Do you know who had custody of this machine from the time it arrived in Suffolk until it was brought to this room and put in evidence as Defendant's Exhibit, Ben Hicks' Machine, E1? A. Why, I had the custody of it myself. Q. How long did you have that machine over at your factory before Ben Hicks showed up? A. Ben Hicks was there eight hours before it arrived. Q. Did Ben Hicks have any drawings or diagrams to show you how to put this machine together? A. No, sir. Q. How long were you, Mr. Little, in making these repairs to this machine? A. About three days."

From the foregoing we think it is clearly established that the Ben Hicks machine produced as an exhibit is precisely as it was in 1900 when built and used up to 1908, at which time, as we have stated, it was discarded by Hicks for a new machine with greater capacity, but involving identically the same principles.

[1] It is well settled that the prior use of an invention for two years invalidates a later patent, even if the patentee has no knowledge of the same. In the case of Reed v. Cutter, 20 Fed. Cas. 435, No. 11,645, 1 Story, 590, Judge Story, who held a patent invalid where prior use was shown, said:

"Under our patent laws, no person who is not at once the first, as well as the original, inventor, by whom the invention has been perfected and put into actual use, is entitled to a patent. A subsequent inventor, although an original inventor, is not entitled to any patent. If the invention is perfected and put into actual use by the first and original inventor, it is of no consequence whether the invention is extensively known or used, or whether the knowledge or use thereof is limited to a few persons, or even to the first inventor himself."

In Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755, the following is to be found:

" * * * To constitute the public use of an invention it is not necessary that more than one of the patented articles should be publicly used. The use of a great number may tend to strengthen the proof, but one well-defined case of such use is just as effectual to annul the patent as many."

In the case of Evans v. Eaton, 3 Wheat. 454, 4 L. Ed. 433, Chief Justice Marshall said:

"Admitting the words 'originally discovered' to be explained or limited by the subsequent words, still, if the thing had been in use, or had been described in a public work, anterior to the supposed discovery, the patent is void. It may be that the patentee had no knowledge of this previous use or previous description; still his patent is void; the law supposes he may have known it."

In the case of Coffin v. Ogden, 85 U. S. 120, 21 L. Ed. 821, which is considered the leading case on this subject, Justice Swayne, who wrote the opinion, said:

"Here it is abundantly proved that the lock originally made by Erbe 'was complete and capable of working.' The priority of Erbe's invention is clearly shown. It was known at the time to at least five persons, including Jones, and probably to many others in the shop where Erbe worked; and the lock was put in use, being applied to a door, as proved by Brossi. It was * * * tested and shown to be successful. These facts bring the case made by the appellees within the severest legal test which can be applied to them. The defense relied upon is fully made out."

The following cases are very much in point: Interurban Railway & Terminal Co. v. Westinghouse Electric Manufacturing Co., 186 Fed. 166, 108 C. C. A. 298; American Roll Paper Co. v. Weston, 59 Fed. 149, 8 C. C. A. 56; Sipp Electric & Machine Co. v. Atwood-Morrison Co., 142 Fed. 149, 73 C. C. A. 367. In the last-named case the court said:

"In support of this contention, the appellees quote the oft-repeated declarations of courts that the burden of proof as to prior use rests upon the defendant, and that every reasonable doubt should be resolved against him, and that courts require that the proof or prior use shall be clear and satisfactory. It is undoubtedly the duty of courts to exercise, as in nearly all cases they are careful to declare, the utmost caution in scrutinizing and considering the testimony offered to establish a prior use. Courts have frequently taken the ground, under the particular circumstances of the case before them, that where a long time has elapsed since the alleged use, and the fact depends upon the fading recollection of a single witness, that an exhibit of the device or thing actually used must accompany the affidavit. There is, however, no hard and fast rule as to this. In this, as in other cases, the weight and effect of testimony must be passed upon, and a conclusion as to the existence of an alleged prior use will be reached if the evidence thereof is clear and satisfactory to the judicial mind."

[2] The testimony in this case is derived from many witnesses who had an opportunity to examine the Ben Hicks machine, and also the John Hundley machine. However, this is not a case wherein the testimony is based entirely upon the recollection of witnesses. The original Ben Hicks machine and the John Hundley machine were exhibited in the court below, and also in this court, where an opportunity was afforded to see these machines just as they were in 1901 and as they were when operated since that date. Ben Hicks in his testimony stated that his machine was used publicly each successive year from 1900 until 1908, and that it was operated successfully. On this point he testified as follows:

"Q. Ben, you say that in 1900 or in 1901 you built this machine, the one exactly as it is now; I mean by that having the same kind of parts. Who did you show that machine to when you got it built? A. Well, now, I couldn't tell you, for there was so many came there to see such a curiosity, a piece of nigger enterprise; I can't tell you. * * * Q. Did you ever use this 1900 machine you have been talking about? A. Yes. Q. Tell us about how you used it? A. I used it; we turned with a crank. Q. What did you use it for? A. Picking off peanuts. * * * Q. How long did you use this machine to pick and stem peanuts? A. I used it until Mr. Myrick bought me out. Q. Why didn't you use the machine after that time? A. Well, because I bought a new picker from Mr. Myrick. Q. When did you buy this new picker from Mr. Myrick? A. Well now, gentlemen, you will have to give me a chance to think again. I haven't got no education. I think it was in 1908. I think so now. I would not be exact, but I think it was 1908. * * * Q. Ben, just before you bought that machine from Mr. Myrick what machine were you using to pick peanuts? A. I was using a little machine (indicating E1)."

John White, another witness, testified as follows:

"Q. During the time you have known Ben Hicks did he ever build any peanut machine? A. Yes, sir. Q. What kind of a peanut machine did he build? A. I do not know the name of it; it was a little small picking machine. Q. Did or did you not ever help Ben Hicks in building or working on the picking machine that you have mentioned? A. Yes, sir; I did. Q. What did you do? A. Well, I was around there helping to handle, cut and saw, weld iron, etc.

Q. Please tell us something about the machinery of this peanut picker machine; what did it do? A. It picked peanuts. Q. What do you mean by picking peanuts? A. I mean that it pulled them off and stemmed them. * * * Q. Why do you say the fall of 1900? A. Well, I know it was then because I helped him work on it, maybe August or September of that year, and got it ready for the fall crop. * * * Q. I mean how often was it used? A. Well, he used it a year or two, or more, I could not tell you. He used it until he got him a larger one. Q. Did you ever help him more than one year use the machine you and Ben built? A. Yes, sir. Q. How many bags of peanuts did you pick off in a day with the machine that you and Ben built? A. About six bags, five or six, not over six."

J. T. Johnson, Jr., testified as follows:

"Q. How did the buying peanuts from this machine cause you to see the machine? A. The reason that I saw the machine the peanuts were so clean that I told Ben Hicks that I thought it was impossible to pick such peanuts so clean with a picker without stems and trash, and he told me that they were picked by the picker and were not repicked by hand. Well, it was a curiosity to see a machine that could pick peanuts at that time, so I went over to see the machine."

William R. Pope, a witness, also testified, among other things, that the first peanut picking machine that he ever saw was one made "by a colored man named Ben Hicks." Witnesses John L. Scott and Junius F. Faircloth testified that they saw this machine in operation in 1900, 1901, and 1902, as we have already stated.

It is well settled that, where the use is already established, it requires full, clear, and convincing proof to overcome the same. In this connection we think it significant that no witness was offered to contradict the evidence of the witnesses who testified as to this point. Thus it will be seen that the existence of the Ben Hicks patent in 1901 was established, in which was shown the same principles found in the Ben Hicks machine of to-day except the movement.

It is also clearly established by the evidence of a number of witnesses that the movement was in the original Ben Hicks machine; that this evidence is corroborated by the existence of the Hundley machine, and these machines have been in use so long that the public has thereby become invested with the title which, under the law, precludes a patent thereon. However, it is insisted by complainant that the Ben Hicks machine was an abandoned patent, and they cite in support of this contention the fact that Ben Hicks said that he threw it on the "dunghill." We do not think his evidence is susceptible of the construction which the complainant seeks to place upon it. The evidence which we have quoted shows that it was not until after the larger machine, better constructed mechanically, had been built in pursuance of the principles upon which his machine was constructed that he threw aside the original machine. The machine produced, in so far as the principle is concerned, is a perfect reproduction of the original Ben Hicks machine. The witness Myrick, who purchased the original Ben Hicks machine, among other things, testified as follows:

"Q. At the time you bought this machine from Ben Hicks was it workable? A. He was picking peanuts with it the day I bought it. Q. Did you see it work? A. I did. Q. How long did you watch it in operation? A. Well, as well as I can remember, we were there a couple of hours. Q. Was it doing good work? A. Fine as I ever saw. Q. How was it operated? A. By horse power."

[3] There is no evidence to indicate that the Ben Hicks machine was an abandoned experiment. He secured the patent for the same, and we think this clearly indicated a purpose to retain rather than to abandon a scheme which he had evolved for a peanut picking machine.

In the case of Ide v. Trorlicht Duncker & Renard Carpet Co. et al., 115 Fed. 137, 53 C. C. A. 341, the court said:

"Clear evidence of an intention to dedicate an improvement to the public is indispensable to establish an abandonment."

The fixed Law of Patents (Macomber) p. 2, states:

"Since abandonment is a forfeiture which places a right beyond possible recall, and since courts do not favor forfeitures, the evidence must be clear and convincing beyond doubt."

"Abandonment is never presumed. On the contrary, the presumption is against abandonment, and the burden is upon the one asserting it to prove it beyond reasonable doubt. The issue of letters patent is prima facie evidence that there has been no abandonment." 30 Cyc. 872.

"Where a defendant has shown knowledge and use of the invention prior to the patent, the burden of proving a still prior invention is thrown on the plaintiff." 30 Cyc. 842.

It should also be borne in mind that, where it appears, as it does in this instance, that one has established his right to a working machine which has been constructed and put into successful operation, even if abandonment by him should be shown, such abandonment would operate as a release of his right to the public, and such invention, being vested in the public for its use, would not be patentable. Of course, if such prior use was only for experimental purposes, then the rule would be different, but such is not the case in this instance. In the case of Swain v. Holyoke Machine Co., 109 Fed. 159, 48 C. C. A. 265, the court said:

"And, where it appears that there has been a public use * * * more than two years before the application, the burden is thrown upon the patentee to establish by full, clear, and convincing proofs that such use * * * was principally and primarily for experimental purposes."

We have carefully considered the authorities relied upon by counsel for complainant, but think they are easily distinguished from the cases which govern in this instance.

[4] In this instance public use for more than two years has been established, as we think, beyond a reasonable doubt. Therefore the burden of proof shifts to the complainant, but we fail to find any evidence tending to show that the Ben Hicks machine was not an original machine, or that it was not used as shown by defendant's testimony, nor do we find any evidence which might be properly treated as an attack upon the veracity of defendant's witnesses. The complainant insists that the construction of the Ben Hicks machine was crude, and therefore did not rise to the dignity of an invention. Of course, this machine was not perfect from a mechanical viewpoint, owing to the lack of facilities under which Hicks labored at the time he constructed it, but it is well established that mechanical perfection is not necessary to sustain an invention, provided the machine invented discloses the principles upon which it may be practically operated.

"A perfect invention does not necessarily mean a perfectly constructed machine, but one so constructed as to embody all of the essential elements of the invention in a form that would make them practical and operative so as to accomplish the result in a practical way." 30 Cyc. 875.

It is insisted by defendant that the failure of Benthall to file an affidavit in support of his application for patent No. 890,401 is fatal to his patent, and that the failure to file in the Patent Office a proper description of the best mode of operating his machine is fatal; it appearing that the mode disclosed describes an inoperative machine, and that the patented machine discloses no invention. While there is much force in these respective contentions, we do not deem it necessary to enter into a discussion of the same, inasmuch as the previous use, we think, of the Ben Hicks machine for more than two years prior to the date of the application for complainant's patent, has been clearly established.

[5] The Ferguson & Benthall patent, No. 808,442, is for a patent picker, and the defendant is charged with the infringement of claim 1 of this patent, which is in the following language:

"(1) A picking machine for picking nuts, etc., from the vines, consisting of a stationary picking screen for catching and holding the nuts, combined with a carrier belt for dragging the vines over the screen, and a stirring device consisting of a horizontally reciprocating frame with downwardly projecting spring fingers arranged above the carrier belt to spread the vines and work the nuts through the screen."

The complainant based its claim of infringement upon the horizontally reciprocating frame, and the defendant insists that the complainant is barred by: (a) Prior use; (b) erroneous grant of patent; (c) prior art.

The defendant's machine built in accordance with the construction of the Ben Hicks machine had, among other things, movable agitators, which, when in operation, moved longitudinally on the top of the machine, while the Ferguson-Benthall patent had movable agitators moving horizontally and crosswise the machine. In support of the contention that the Hicks machine contained a longitudinal movable picker and was constructed in 1901 the defendant introduced a number of witnesses. Mr. Pope testified that the first picking machine of which he had any knowledge was the machine made by a colored man named Ben Hicks, and Hicks, among other things, testified that a machine that he built in 1900 had agitator boards upon it. Hicks, when asked if there was anything that moved in the top of the machine, said:

"A. Dat moved in the top of the machine? Yes, sir; yes, sir; it did. Had two boards with teeth in 'em, moved by centric wheels (shows with his hands alternating movement, backward and forward). Q. Are you sure that the machine in 1900 had these boards on it that moved backward and forward? A. Yes, sir."

John White, another witness, who helped Hicks build the machine, fully corroborated his testimony in this respect. Among other things, he said:

"Well, the stemmer and the fan moved with a belt running over those cogs there that run both of the concerns and then with a piece of wood on the out-

side that went to the fan shaft to the stemmer. Now, the top there (indicates with his thumb over his shoulder Defendant's Exhibit, Ben Hicks' Machine, E1) two boards working that way (indicating by his hands backward and forward motion) zigzag. Those boards tore the vines to pieces by having nails through them. That's about all I know about that."

Witness Faircloth testified that he saw the machine, and that it had an agitating mechanism on top of it. The witness Johnson also described the construction of the movable agitator boards on the top of the machine, and said that it was turned by a crank; that nails were driven through the boards on top of the machine and worked in a zigzag motion (indicating back and forth movement of the hands), tearing the vines to pieces, dropping the peanuts on the canvas belting, the canvas belting delivering the peanuts in the stemming trough. Scott, another witness, testified as follows:

"Q. You say that your attention was attracted by a noise; do you mean that when you went over to Ben Hicks' house the peanut picker and stemmer was in operation? A. Yes, sir. Q. Please tell us about the operation of this machine that you saw at that time, and tell us about the movements of the various parts while it was operating. A. The first thing that I noticed on the top of the machine there was two boards that went in this way zigzag (indicating with hands back and forth motion), and also that the peanuts would fall from the vines down on something that looked like a canvas belt. * * *"

The most of these witnesses testified that they saw the Ben Hicks machine, containing these boards, as early as 1901. We think that this testimony establishes the fact that Ben Hicks was using a machine identical with the exhibit offered by defendant anterior to 1902, and the testimony clearly shows that such machine was equipped with the movable agitators, as hereinbefore described. The fact that the defendant adhered to the principles of the Ben Hicks machine in the construction of its machine clearly negatives the idea that it was its intention to copy the device contained in the complainant's machine, and it should also be remembered that the defendant had purchased the Ben Hicks patent for a machine which had been built in 1901, which, in our opinion, strongly corroborates the statement of defendant that it was not its purpose or intention to appropriate to its own use any right that might have been acquired by the complainant under its patent. From what we have stated we think the evidence clearly establishes the fact that the Ben Hicks machine, involving the same principles contained in complainant's machine, was in practical use for more than two years prior to the granting of a patent to complainant, and that, therefore, the court below erred in holding that the Ferguson-Benthall patent was not anticipated and invalidated because of the prior construction and use of the Ben Hicks machine.

The defendant also insists that the Ferguson-Benthall patent is invalid by reason of prior art; in other words, that there are many machines on record in the Patent Office constructed upon the same principle as the Ferguson-Benthall patent, chief among these being what is known as the Crocker patent, No. 97,364, granted November 30, 1869. Mr. Foster, who was introduced by defendant as an expert,

among other things, testified that he found all the elements of the claim in suit in the Crocker patent, as appears in the following parallels:

| Ferguson-Benthall Patent, No. 808,442. Claim 1. | Crocker Patent, 97,364. |
|---|---|
| A picking machine for picking nuts, etc., from the vines consisting of— | A picking machine for picking nuts, etc., from the vines consisting of— |
| 1. A stationary picking screen: (a) For catching and holding the nuts. | 1. A stationary picking screen: (a) For catching and holding the nuts. |
| 2. A carrier belt: (a) For dragging the vines over the screen. | 2. A carrier belt: (a) For dragging the vines over the screen. |
| 3. A stirring device consisting of: (a) A horizontally reciprocating frame with downwardly projecting spring fingers, arranged above the carrier belt to spread the nuts through the screen. | 3. A device arranged above the carrier belt that thins out the vines to permit the nuts to fall through the screen. |

It is apparent to even a casual observer that, with the exception of the horizontally reciprocating frame, the claims of the Crocker patent are identical with the Ferguson-Benthall patent.

A number of other patents are relied upon to sustain the contention that the Ferguson-Benthall patent is invalid by reason of the prior art, but we do not deem it necessary to enter into an extended discussion of this phase of the question, feeling as we do that for the reasons stated the decree of the court below should be reversed.